# 24-826

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖

MANGROVE PARTNERS MASTER FUND, LTD., SM MERGER/ARBITRAGE, L.P., on behalf of themselves and all others similarly situated, SM INVESTORS, L.P., on behalf of themselves and all others similarly situated, SM INVESTORS II, L.P., on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

EHAB KHALIL,

*Plaintiff-Movant-Appellant,*

(*Caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

MICHAEL B. EISENKRAFT
LAURA H. POSNER
BENJAMIN F. JACKSON
BRENDAN R. SCHNEIDERMAN
COHEN MILSTEIN SELLERS
   & TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797

STEVEN J. TOLL
COHEN MILSTEIN SELLERS
   & TOLL PLLC
1100 New York Avenue, NW, Suite 500
Washington, DC 20005
(202) 408-4600

*Attorneys for Plaintiffs-Appellants*

MASO CAPITAL INVESTMENTS LIMITED, MASO CAPITAL ARBITRAGE FUND LIMITED, BLACKWELL PARTNERS LLC SERIES A, STAR V PARTNERS LLC,

*Plaintiffs,*

—against—

BRISTOL–MYERS SQUIBB COMPANY, GIOVANNI CAFORIO, VICKI L. SATO, PETER J. ARDUINI, ROBERT BERTOLINI, MATTHEW W. EMMENS, MICHAEL GROBSTEIN, ALAN J. LACY, DINESH C. PALIWAL, THEODORE R. SAMUELS, GERALD L. STORCH, KAREN H. VOUSDEN, CHARLES BANCROFT, KAREN M. SANTIAGO, SAMIT HIRAWAT,

*Defendants-Appellees,*

DAVID V. ELKINS,

*Defendant.*

## CORPORATE DISCLOSURE STATEMENT

Counsel hereby states that: (i) Mangrove Partners Master Fund, Ltd. is now known as Mangrove Partners IM. Mangrove Partners IM is a wholly owned subsidiary of Mangrove Holding; (ii) Mangrove Holding has no parent corporation and no publicly held corporation owns more than 10% of Mangrove Holding; (iii) SM Investors II, L.P. has no parent corporation and no publicly held corporation owns more than 10% of SM Investors II, L.P.; (iv) SM Investors, L.P. has no parent corporation and no publicly held corporation owns more than 10% of SM Investors, L.P.; (v) SM Merger/Arbitrage, L.P. has no parent corporation and no publicly held corporation owns more than 10% of SM Merger/Arbitrage, L.P.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..............................................................1

JURISDICTIONAL STATEMENT ........................................................3

STATEMENT OF THE ISSUES...........................................................3

STATEMENT OF THE CASE................................................................4

PROCEDURAL HISTORY..................................................................12

SUMMARY OF THE ARGUMENT .....................................................13

STANDARD OF REVIEW ..................................................................14

ARGUMENT .......................................................................................15

    A.    The Exchange Act Defendants acted with scienter.............................15

        1.    The Complaint pleads conscious or reckless misbehavior by the Exchange Act Defendants. .............................16

        2.    Plaintiffs adequately pled evidence of motive and opportunity. ......................................................45

    B.    Securities Act Claims. ........................................................50

        1.    The omissions at issue are not protected by the PSLRA's safe harbor provision.................................51

        2.    The misstatements at issue are not forward looking.................53

        3.    The statements at issue were not accompanied by meaningful cautionary language. .............................55

    C.    Plaintiffs adequately pled the Section 14(a) and "Control Person" Claims. ......................................................56

    D.    In the alternative, Plaintiffs should be granted leave to amend their pleadings. ......................................................57

CONCLUSION....................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Africa v. Jianpu Tech. Inc.*,
    No. 21-CV-1419 (JMF), 2022 WL 4537973 (S.D.N.Y. Sept. 28,
    2022) .................................................................................................36

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
    No. 20-CV-9568, 2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023).......................21

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    No. 09-CV-2227 (PAC), 2015 WL 5003528 (S.D.N.Y. Aug. 20,
    2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018) .............................................38

*In re AstraZeneca Sec. Litig.*,
    559 F. Supp. 2d 453 (S.D.N.Y. 2008) ...........................................20, 21

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ......................................................57

*AUSA Life Ins. Co. v. Ernst & Young*,
    206 F.3d 202 (2d Cir. 2000) ....................................................48

*Baum v. Harman Int'l Indus., Inc.*,
    408 F. Supp. 3d 70 (D. Conn. 2019)...............................................52

*In re BioMarin Pharm. Inc. Sec. Litig.*,
    No. 3:20-CV-06719, 2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ..........20, 34, 56

*Bisel v. Acasti Pharma, Inc.*,
    No. 21 CIV. 6051 (KPF), 2022 WL 4538173 (S.D.N.Y. Sept. 28,
    2022) ..............................................................................51

*In re BISYS Sec. Litig.*,
    397 F.Supp.2d 430 (S.D.N.Y. 2005) ..............................................43

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
    850 F.3d 58 (2d Cir. 2017) ......................................................15

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006) ............................................30

*In re Comverse Tech., Inc. Sec. Litig.*,
  543 F. Supp. 2d 134 (E.D.N.Y. 2008) ................................................23

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan
  Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ................................................45

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023) ................................................56

*Freudenberg v. E*Trade Financial Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................25

*Friedl v. City of New York*,
  210 F.3d 79 (2d Cir. 2000) ................................................57

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018) ................................................25, 51, 52

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015) ................................................56

*Heinze v. Tesco Corp.*,
  971 F.3d 475 (5th Cir. 2020) ................................................52

*Heller v. Goldin Restructuring Fund, L.P.*,
  590 F. Supp. 2d 603 (S.D.N.Y. 2008) ................................................27, 35

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016) ................................................35

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020) ................................................39

*In re JP Morgan Chase Sec. Litig.*,
  363 F.Supp.2d 595 (S.D.N.Y. 2005) ................................................43

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  607 F. Supp. 3d 381 (S.D.N.Y. 2022) ................................................30

*Katz v. Image Innovations Holdings, Inc.*,
  542 F.Supp.2d 269 (S.D.N.Y. 2008) ................................................46

*In re Lions Gate Ent. Corp. Sec. Litig.*,
    165 F. Supp. 3d (S.D.N.Y. 2016) ........................................................35

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
    No. 13-CV-214, 2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ...........23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ...............................................39, 40, 42

*In re MBIA, Inc., Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010) ..............................................44

*In re Mirena IUD Prods. Liab. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016) ...............................................38

*Nandkumar v. AstraZeneca PLC*,
    No. 22-2704-CV, 2023 WL 3477164 (2d Cir. May 16, 2023).........39

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009) ..............................................44

*In re NTL, Inc. Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004) .................................................30

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019) .................................................46

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023) .............................................................54

*In re Peabody Energy Corp. Sec. Litig.*,
    No. 20-CV-8024, 2022 WL 671222 (S.D.N.Y. Mar. 7, 2022).........23

*In Re Philip Morris Int'l Inc. Sec. Litig.*,
    89 F.4th 408 (2d Cir. 2023) .......................................................53, 54

*Press v. Chem. Inv. Servs. Corp.*,
    166 F.3d 529 (2d Cir. 1999) .............................................................45

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ........................................35, 36

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ...............................................................55

*In re Romeo Power Inc. Securities Litig.*,
    No. 21-CV-3362, 2022 WL 1806303 (S.D.N.Y. June 2, 2022) ..................26, 35

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ...............................................................45

*Rotunno v. Wood*,
    No. 22-502, 2022 WL 14997930 (2d Cir. Oct. 27, 2022) ...................................46

*Rudani v. Ideanomics, Inc.*,
    No. 19 CIV. 6741 (GBD), 2020 WL 5770356 (S.D.N.Y. Sept. 25,
    2020) ............................................................................................52

*In re Salix Pharms., Ltd.*,
    14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22,
    2016) ............................................................................................52

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip
    Morris Cos., Inc.*,
    75 F.3d 801 (2d Cir. 1996) ...............................................................45

*Saraf v. Ebix, Inc.*,
    632 F. Supp. 3d 389 (S.D.N.Y. 2022) ................................................50

*Schwab v. E*TRADE Fin. Corp.*,
    258 F. Supp. 3d 418 (S.D.N.Y. 2017) ................................................42

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................20

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021) ...............................................15, 21, 47

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020) ...............................................................38

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010) ...............................................................55

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ......................................................................20

*In re Teva Sec. Litig.*,
    671 F. Supp. 3d 147 (D. Conn. 2023) ...............................................44

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013) .........................................27, 35

*Venkataraman v. Kandi Techs. Grp., Inc.*,
    No. 20-CV-8082, 2022 WL 4225562 (S.D.N.Y. Sept. 13, 2022) .....................23

*In re VEON Ltd. Sec. Litig.*,
    No. 15-cv-08672 (ALC), 2017 WL 4162342 (S.D.N.Y. Sept. 19,
    2017) ...............................................................................42

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) .......................................................55, 56

*Woods v. Maytag Co.*,
    807 F. Supp. 2d 112 (E.D.N.Y. 2011) ..............................................21

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) .......................................................27

## PRELIMINARY STATEMENT

Bristol Myers Squibb ("Bristol") agreed, as part of its multibillion-dollar merger with Celgene, another major pharmaceutical company, to issue Contingent Value Rights ("CVRs") to Celgene shareholders which would pay out $9 per CVR if, and only if, three of Celgene's major drugs all received Food and Drug Administration ("FDA") approval by certain milestone dates ("Milestone Drugs"). That $9 per CVR translated to Bristol being obligated to pay $6.4 billion to CVR holders. If one of the Milestone Drugs missed its milestone date for FDA approval by even one day, the CVRs would expire worthless and Bristol would save $6.4 billion.

As soon as Bristol completed its takeover of Celgene, weird things started happening with respect to the FDA approval process for one of the Milestone Drugs—a promising cancer therapy called Liso-cel that the FDA had previously designated for special fast track status and which had been proceeding smoothly prior to the merger. As described in detail in the operative Complaint, after taking over the Liso-cel FDA approval process from Celgene, Bristol made a series of highly unusual "errors" with respect to the FDA approval process—from incorrectly filling out portions of critical forms to not fixing easily remediable issues with labeling and manufacturing—that each caused delays in the FDA approval process. Moreover, each time Bristol fixed one of these errors, the fix took far longer than

1

normal. Altogether there were **nine** highly unusual delays in the FDA approval process for Liso-cel caused by Bristol's errors and its delay in remedying those errors. According to an FDA Biologics Expert, who previously worked for the FDA as senior reviewer and investigator for its Center for Biologics Evaluation and Research ("CBER") where he reviewed drugs like Liso-cel, **one** error or delay of this type for a company as experienced as Bristol and a drug as important as Liso-cel would be incredibly rare—**nine** is completely unheard of. JA-1037. These errors and delays added up and Liso-cel, which was scheduled for FDA approval four and half months before its milestone date when Bristol acquired Celgene—missed its December 31, 2020, "Milestone Date" by thirty-six days. The other two drugs easily made their milestone dates. Economically, this was the perfect scenario for Bristol—it avoided paying CVR holders $6.4 billion, but the blockbuster drugs it acquired from Celgene were all approved in relatively short order. Plaintiffs alleged that this series of incredibly rare errors—all of which combined to delay Liso-cel **just enough** to save Bristol $6.4 billion—were not coincidences at all, but instead were a deliberate scheme by Bristol to delay Liso-cel approval in order to avoid the $6.4 billion payout to CVR holders.

Defendants do not credibly dispute these facts; instead, they claim only that Plaintiffs have not alleged enough smoke to infer fire. Defendants are wrong and the District Court's dismissal should be reversed.

2

# JURISDICTIONAL STATEMENT

The District Court possessed subject-matter jurisdiction over Counts One through Three pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and over Counts Four through Six pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v.

The District Court docketed the Order granting Defendants'[1] Motion to Dismiss Lead Plaintiffs' Consolidated Class Action Complaint with prejudice on February 29, 2024, JA-1180-95, and entered Judgment on the same day, JA-1196-97. Plaintiffs timely noticed their Appeal on March 28, 2024. JA-1198.

# STATEMENT OF THE ISSUES

1. Did the District Court err when it found Plaintiffs failed to adequately plead scienter for the Individual Defendants and Bristol and dismissed Plaintiffs' claims under Section 10(b) and Rule 10b-5(b), Section 14(a), and Section 20(a) of the Securities and Exchange Act of 1934?

2. Did the District Court err when it dismissed, as inactionable under the safe harbor provision of the Private Securities Litigation Reform Act of 1995,

---

[1] This includes Bristol, CEO Giovanni Caforio, Chief Medical Officer Samit Hirawat, and directors Vicki L. Sato, Peter J. Arduini, Robert Bertolini, Matthew W. Emmens, Michael Grobstein, Alan J. Lacy, Dinesh C. Paliwal, Theodore R. Samuels, Gerald L. Storch, Karen H. Vousden, former CFO Charles Bancroft, and former Principal Accounting Officer Karen M. Santiago.

Defendants Bristol, Caforio, Hirawat, Sato, Arduini, Bertolini, Emmens, Grobstein, Lacy, Paliwal, Samuels, Storch, and Vousden constitute the "Exchange Act Defendants." The Exchange Act Defendants, minus Bristol, constitute the "Individual Defendants." The Exchange Act Defendants, minus Hirawat and plus Bancroft and Santiago, constitute the "Securities Act Defendants."

Plaintiffs' claims under Sections 11 and 15 of the Securities Act of 1933 that Defendants made false and/or misleading statements and/or omissions in the Registration Statement and Joint Proxy regarding, *inter alia*, the diligence they would put forth in getting Liso-cel FDA approval before its milestone date?

3. Did the District Court err when it dismissed the action with prejudice?

## STATEMENT OF THE CASE

Bristol is one of the world's largest pharmaceutical companies. JA-988. In 2018, Bristol offered to buy another pharmaceutical giant, Celgene, mainly to acquire its pipeline of five drugs slated for imminent FDA approval. JA-992. Bristol and Celgene ultimately agreed on a deal whereby the existing Celgene shareholders received, for each share of Celgene common stock, one share of Bristol common stock, $50 in cash, and one CVR with a potential payout valued at $9 per CVR. JA-995-96.

A CVR is a security payable upon the occurrence of a specific future event. JA-988. For the CVRs' potential $9 payout, Bristol insisted on an atypical "all-or-nothing" approach under which Bristol would pay $9 per CVR only if **all three** Milestone Drugs were approved prior to specific milestone dates: (1) Liso-cel by December 31, 2020; (2) Ozanimod by December 31, 2020; and (3) Ide-cel by March 31, 2021. JA-994-95. The $9 per CVR potential payout represented an extra ***$6.4***

4

*billion* in cash for Celgene's former shareholders. Bristol represented it would use "diligent efforts" to ensure the drugs' approval by the deadlines, including using "such effort and … such resources normally used [for] . . . development or commercialization of" these drugs, benchmarked against other drugs with "similar market potential at a similar stage in its development or product life." JA-995.

Liso-cel, one of the three Milestone Drugs, is a cancer therapy for non-Hodgkin's lymphoma, which kills approximately 20,000 Americans and 250,000 people worldwide each year. JA-988, 991. Liso-cel was so promising that the FDA designated it a "Breakthrough Therapy," "Regenerative Medicine Advanced Therapy," and a "Priority Review" therapy, entitling it to an expedited approval process conducted by a dedicated team of senior FDA personnel devoted to ensuring it would enter the market as soon as possible. JA-988, 991, 1011. Liso-cel is also a "biologic" drug, meaning Bristol had to submit a Biologic License Application ("BLA") to the FDA to obtain approval to market Liso-cel in the United States. The most important module of a BLA is the Chemistry, Manufacturing & Controls ("CMC") module, which includes a detailed description of the manufacturing process and analyses of its safety. JA-996.

Before the merger, Celgene was on track to secure FDA approvals of all three drugs *well before* their milestone dates. JA-1021, 1028, 1031. Celgene submitted the first component of the Liso-cel BLA on September 30, 2019, before the merger

closed, *without issue*. After the merger closed on November 20, 2019, when Bristol took control of Liso-cel's FDA approval process, JA-1028, the FDA's target approval date for Liso-cel was August 17, 2020—*four and a half months* before its Milestone Date. JA-1002.

After Bristol took over, the Liso-cel approval process suddenly went downhill. First, there was an unusual and unexplained pause of about a month in the BLA submissions for Liso-cel between late November and Bristol's submitting the CMC module on December 18, 2019. JA-996, 1029. According to Plaintiffs' FDA Biologics Expert—who previously worked for the FDA as senior reviewer and investigator for the CBER—submitting key parts of the BLA's CMC section seventy-nine days (September 30, 2019, to December 18, 2019) after the rest of the application was "unusually long." JA-1016. Even after this long delay, Bristol omitted basic data detailing tests of Liso-cel's safety and efficacy (*i.e.*, assays) and studies assessing whether those tests were accurate (*i.e.*, validation)—*the key data required by the FDA and which Bristol does not dispute it had in its possession*— and instead only included facially inadequate "summaries" of the required assays and validation. JA-988, 994, 1017. According to the FDA Biologics Expert, a company "seeking approval of a biologic would *not* have omitted such assays from its BLA" and would understand "that omitting such assays could significantly delay FDA approval." JA-1017.

The FDA completed its initial review of the Liso-cel BLA on February 13, 2020, and, on March 23, 2020, asked Bristol to submit the missing data. Bristol did not respond *for twenty-three days*, even though the data was at Bristol's fingertips. JA-1019. The FDA Biologics Expert called this delay "highly unusual." *Id.*

When Bristol *finally* amended the Liso-cel BLA on April 15, 2020, the FDA was forced to take the rare step of issuing a "Major Amendment" because Bristol failed to include information it could have and should have included in its original CMC submission. *See* JA-1019. As Bristol knew it would, this automatically extended the FDA's target approval date by *ninety days*, from August 17, 2020, to November 16, 2020, just forty-five days before the Milestone Date, and caused the rescheduling of the inspection of the two Liso-cel manufacturing facilities from June 2020 to October and December 2020, respectively, mere weeks before the Milestone Date. JA-999.

Multiple former employees confirmed Bristol *knew* Liso-cel's manufacturing facilities were unprepared for FDA inspections due to a litany of basic deficiencies of the sort that any large, experienced pharmaceutical company like Bristol could have easily remediated. JA-989. Despite additional weeks to prepare, Bristol failed to address these easily solvable issues. *Id.* For example, the Lonza facility lacked separate storage areas for materials to avoid mix-ups; labeled its materials in a manner that made mix-ups likely, if it labeled materials at all; had poorly organized

7

and maintained freezer bins; had a deficient inventory management system; failed to lock freezers containing quarantined material; and failed to timely ensure expired materials were properly discarded. JA-1002-03, 1038-39. Multiple confidential witnesses ("CWs") stated these issues were known well in advance of the inspections, and the FDA Biologics Expert confirmed these issues should have been identified during routine mock inspections or other preparations and could easily have been fixed prior to the FDA inspections. JA-1045-46. Further, instead of sending experienced personnel to oversee the FDA inspection process, Bristol sent a junior employee with no experience working on an FDA pre-approval inspection, a highly unusual move and contrary to standard industry practice. JA-1023-24. Bristol did not disclose any of these issues to investors, let alone fix them prior to the FDA inspections. Instead, it falsely told investors Liso-cel's manufacturing facilities were "launch ready." JA-1034.

Despite the ongoing COVID-19 crisis, the errors which caused these inspection failures, such as preventing mold and using the right kind of disinfectants, were "wholly unrelated to the global pandemic." JA-1060. And CW #10, an executive in the quality department of Celgene/Bristol, made clear that Bristol "cannot blame the delay of approval of Liso-cel on COVID-19 alone." JA-1059. *See also* JA-996 (delay in filing CMC "unjustifiable and highly unusual"); JA-1005 (accidentally submitting a woefully deficient CMC is "implausible"); JA-1006

8

("Bristol's eleven-month approval timeline for Liso-cel is a statistical anomaly when weighed against … comparators."); JA-1032 (twenty-three day delay in submitting amendment was "highly unusual"); JA-1036, 1042 (inspection deficiencies were "unusual and avoidable" and violations were "glaring"); JA-1060 (Form 483 response was "obviously inadequate"); JA-114 (two-month gap between the inspection and the final Form 483 response is "unheard of"); JA-1095 (sending inexperienced staff member to prepare facility for inspection was "shocking").

Following the conclusion of the inspections on October 16 and December 10, 2020, the FDA issued Forms 483 (*i.e.*, reports detailing violations of FDA regulations) for both facilities, requiring a response and remediation plan. JA-997, 1022-27. According to the FDA Biologics Expert, these violations comprised unusual, easily avoidable errors that any company that licenses biological products should have avoided. JA-1022-27. Nonetheless, Bristol took ***twenty-one calendar days*** to respond to the first Form 483—even though, according to the FDA Biologics Expert, it could easily have done so in 10 calendar days. JA-1023. Bristol submitted its response to the second Form 483 on December 23, 2020—***just days*** before Liso-cel's December 31, 2020, Milestone Date. JA-1027. Bristol's responses to both Forms 483 were also deficient, causing further delay. JA-1023, 1027.

The FDA finally approved Liso-cel's BLA on February 5, 2021—thirty-six days after the Milestone Date lapsed, obliterating a $6.4 billion potential payment

by Bristol to the CVR holders. JA-990, 999, 1027, 1056. After missing the Liso-cel Milestone Date, Bristol miraculously recovered its competence and secured FDA approval without issue for the other pipeline drugs before their milestone dates.[2] JA-1030-31, 1068.

At bottom, for a promising and life-saving drug like Liso-cel to take as long as it did to be approved is essentially unheard of. Indeed, the FDA approved a number of directly analogous drugs in a timely fashion *during the same period*, despite the COVID-19 pandemic. As the Complaint demonstrates, under an apples-to-apples comparison, the delayed approval timeline for Liso-cel was a statistical anomaly, even accounting for the complexity of its approval process and a global pandemic. The statistical analysis conducted by the FDA Biologics Expert included non-priority review biologics, meaning it "actually *overestimated* the approval time for Liso-cel comparators," JA-1006 (emphasis added), because it compared Liso-cel to *all* comparable drug therapies, not just those receiving priority review like Liso-cel. Thus, even when comparing the approval timeline of Liso-cel to therapies that the FDA explicitly considered lower priority, *Liso-cel took a statistically anomalously long time to be approved.*

---

[2] Celgene submitted the complete FDA approval application for Ozanimod, the third drug, well before the merger closed and Bristol took control of the process. JA-1016.

For Bristol's finances, however, the delay in Liso-cel's approval was a dream scenario: it allowed Bristol to avoid the $6.4 billion payout to the CVR holders while sacrificing only a month of Liso-cel's being on the market, a very short period of time in the lifecycle of a biologic. JA-990, 1028. The near-miss also proved lucrative for the Individual Defendants, who held millions of dollars' worth of Bristol stock that became significantly more valuable once Bristol avoided the $6.4 billion CVR payout. *See infra* § I.B.

As they intentionally slow-rolled Liso-cel's approval, Defendants repeatedly made materially false and misleading statements concerning the "***diligent efforts***" Bristol was purportedly making to secure Liso-cel's approval by the Milestone Date, the likelihood of securing approval by that date, and the purported value of the CVRs. JA-991, 995, 1026, 1033. Additionally, the Individual Defendants repeatedly allayed investors' concerns about the CVR payouts and suggested the approval process was proceeding apace without significant issue—all without disclosing they were intentionally delaying the process. JA-1047-1064.

Plaintiffs brought this federal securities action on behalf of all persons who acquired CVRs pursuant to the merger and from November 20, 2019, through December 31, 2020, asserting claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10(b), 14(a), 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

11

## PROCEDURAL HISTORY

Plaintiffs filed a Consolidated Amended Complaint on February 23, 2022, asserting claims under Sections 11 and 12(a)(2) of the Securities Act of 1933, Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, and "controlling person" claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act.  JA-28.  In an Opinion and Order issued on March 1, 2023, the Court granted Defendants' April 8, 2022, Motion to Dismiss the Consolidated Amended Complaint in its entirety (ECF No. 99), dismissing with prejudice all claims under the Securities Act and under section 14(a) of the Exchange Act, while dismissing with leave to replead the claims under Sections 10(b) and 20(a) of the Exchange Act. JA-960.

Plaintiffs filed the Second Amended Complaint ("Complaint") on April 14, 2023, re-asserting the same Securities and Exchange Act claims against the same defendants (except that Plaintiffs withdrew all claims against David V. Elkins, Bristol's Chief Financial Officer).  On May 12, 2023, Defendants moved to dismiss the Complaint.  ECF No. 119.  On February 29, 2024, the District Court again granted Defendants' motion, this time dismissing all claims with prejudice.  JA-1180.

On March 28, 2024, Plaintiffs timely filed their notice of appeal.  JA-1198.

## SUMMARY OF THE ARGUMENT

Plaintiffs satisfied the scienter requirement for their Exchange Act claims by alleging the Exchange Act Defendants both consciously misbehaved or acted recklessly *and* had motive and opportunity to commit the alleged fraud.

Plaintiffs allege—with support from an FDA Biologics Expert with significant experience approving drugs just like Liso-cel—that the series of nine highly unusual delays and errors in the Liso-cel approval process supports an inference that these delays and errors were deliberate or reckless, not coincidental accidents. Additionally, Plaintiffs allege Bristol's top personnel, including the Individual Defendants, acted with scienter because they: (i) were in regular contact with the FDA about the Liso-cel approval process; (ii) sat on committees expressly tasked with monitoring the approval of Liso-cel; (iii) knew of the Liso-cel approval missteps based on allegations from CWs and the FDA Biologics Expert; and (iv) repeatedly spoke about the FDA approval process for Liso-cel, so had timely and material information about it. This is sufficient to allege scienter for the Individual Defendants. Corporate scienter for Bristol is separately established by this evidence, but also by the fact that many high-level officers were aware of the unusual problems and missteps in the Liso-cel approval process.

Plaintiffs' allegation that the Exchange Act Defendants were facing significant pressure and profited by $6.4 billion by slow-rolling Liso-cel approval sufficiently alleges that they had motive and opportunity to commit the fraud.

Regarding the Securities Act claims, the District Court erred in dismissing Plaintiffs' claims as protected by the Private Securities Litigation Reform Act's ("PSLRA") safe harbor for three reasons. First, the *omissions* at issue are not protected by the PSLRA's safe harbor provision. Second, the misstatements at issue are not forward looking because they involve "then-present facts" rather than future predictions. Finally, the statements at issue were not accompanied by meaningful cautionary language.

Because these claims should not have been dismissed, the District Court also erred in dismissing Plaintiffs' Section 14(a) and control person claims.

Finally, the District Court erred in denying leave for Plaintiffs to amend their pleadings, because Plaintiffs are currently waiting for the FDA to provide relevant Freedom of Information Act ("FOIA") documents that likely contain information that could alleviate the District Court's concerns regarding scienter.

## STANDARD OF REVIEW

This Court reviews "*de novo* a district court's decision to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor."

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc*., 850 F.3d 58, 77 (2d Cir. 2017).

"To survive a 12(b)(6) motion, the Complaint must contain factual allegations that

plausibly give rise to an entitlement to relief." *Id*. "As always at this stage of the

litigation, [courts] draw [their] discussion of the facts from the complaint, which

must be taken as true." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 69 (2d

Cir. 2021).

## ARGUMENT

### A.     The Exchange Act Defendants acted with scienter.

To establish scienter, "a complaint may (1) allege facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts

to show that defendants had both motive and opportunity to commit fraud." *Set

Cap.*, 996 F.3d at 78. Courts in the Second Circuit "evaluate the sufficiency of a

complaint's allegations of scienter 'holistically,' considering '*all* of the facts alleged,

taken collectively,' rather than 'any individual allegation, scrutinized in isolation.'"

*Set Cap.*, 996 F.3d at 78 (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S.

308, 323, 326 (2007)) (emphasis in original). For an inference of scienter to be

"strong," "a reasonable person must deem it cogent and at least as compelling as any

opposing inference one could draw from the facts alleged." *Id.*

Plaintiffs' allegations here—even when taken separately, and certainly when considered holistically—tell a plausible story of conscious or reckless misbehavior sufficient to survive a motion to dismiss.

**1.    The Complaint pleads conscious or reckless misbehavior by the Exchange Act Defendants.**

**a.    The nine missteps in the FDA approval process support an inference of conscious or reckless delay.**

When Bristol took over Celgene on November 20, 2019, Liso-cel and the other pipeline drugs were all "on track" for approval long before their milestone dates, with Liso-cel on track to be approved four-and-a-half months before its December 31, 2020, Milestone Date.  JA-1015, 1017.  When Bristol took over the FDA approval process for the pipeline drugs, however, it immediately went off the rails.  In the approximately thirteen months between Bristol taking control of Celgene and the Liso-cel approval process and the Milestone Date, Bristol made *nine* separate inexplicable errors with respect to Liso-cel's FDA approval process— with each error being highly unusual for any drug company to make, much less one as large, sophisticated and experienced as Bristol—and each unusual error delaying the FDA approval of Liso-cel.  Due to this highly unusual and uncharacteristic series of errors over this thirteen-month period, Liso-cel's Milestone Date passed and Bristol avoided the $6.4 billion payout. Liso-cel was approved thirty-six days after the Milestone Date, dramatically improving Bristol's financial condition.

16

This dramatic series of nine highly unusual errors, combined with the Exchange Act Defendants' admitted knowledge of the Liso-cel approval process, service on committees devoted to the Celgene merger and FDA approvals, and confirmation of the Exchange Act Defendants' knowledge by multiple CWs, is sufficient to allege a strong inference of scienter.

Bristol's nine unusual errors that caused Liso-Cel to miss its Milestone Date are inexplicable except when understood as an intentional or reckless attempt to avoid paying the $6.4 billion it would owe investors.

***First***, after taking over Celgene, Bristol took ***twenty-nine days*** to submit the Liso-cel BLA's CMC module, a delay Plaintiffs' FDA Biologics Expert confirmed was "unusually" long. JA-1029.

***Second***, despite this unusual delay, Bristol inexplicably omitted from the CMC module the underlying assay data that must be included in such a submission and which Bristol had in its possession. JA-997, 1031. According to the FDA Biologics Expert, a company diligently seeking approval of a biologic would never have omitted such assays from its BLA submission because it would have understood those omissions would significantly delay FDA approval. JA-1031.

***Third***, when the FDA asked for the missing data, Bristol did not provide it for ***twenty-three more days***—a delay the FDA Biologics Expert described as "highly unusual" since Bristol had the data in an easily accessible form and location. JA-

17

1032. Had this unexplained delay and the delay in submitting the facially deficient CMC module alone—which totaled fifty-two days of delay—been avoided, Liso-cel would have made its Milestone Date.

*Fourth*, Bristol's late submission of the required CMC data predictably caused further delay—a Major Amendment that triggered a ***ninety-day delay*** of the target approval date. JA-1077. This was a development the FDA Biologics Expert called the "rarest of rare occurrences" for a Priority Review cancer therapy, and which CW #1 had never seen before despite years of industry experience. JA-1033.

*Fifth*, the FDA identified myriad rudimentary problems at Bristol's Juno manufacturing facility. According to the FDA Biologics Expert and multiple CWs, these were obvious, easily preventable issues that would normally would have been avoided by a competent pharmaceutical company familiar with biologics, like Bristol. JA-989-90. Predictably, the FDA issued a Form 483 identifying these deficiencies.

*Sixth*, Bristol took ***twenty-one days***—the ***maximum allowed***—to respond to the Form 483, even though this could have easily been done in ten days, per the FDA Biologics Expert. JA-1036-37.

*Seventh*, Bristol's response itself was found deficient by the FDA, yet Bristol did not properly supplement it until less than two weeks before the Liso-cel Milestone Date. JA-1037.

18

*Eighth*, Bristol repeated *many of the same or similar* errors at the Lonza facility. JA-1037-38. According to a number of former Lonza employees, these problems were obvious and Bristol employees were aware of them but did not fix them in advance of the Lonza facility inspection. JA-1034.

And *ninth*, Bristol's responses to the FDA's deficiency letter on Lonza were also found deficient and required supplementation. According to the FDA Biologics Expert, it is "rare and contrary to standard industry practice for an initial response to a Form 483 to be insufficient—and even rarer . . . for a second response to also be insufficient." JA-1046.

After these nine—*nine!*—events, *each one* highly unusual for a large, sophisticated, and experienced drug company, Liso-cel's Milestone Date passed and Bristol avoided the $6.4 billion payout. Liso-cel was approved thirty-six days later.

Defendants suggest that these events—all of which caused delays in approval of the exact drug whose rapid FDA approval would trigger a massive liability for Bristol—were random coincidences. That suggestion—that these nine events all happened *coincidentally* so as to delay the FDA approval of Liso-cel *just enough* to save Bristol *$6.4 billion*—is not the most plausible inference that can be drawn from that series of events.

The far more plausible inference is that this series of highly atypical mishaps were intentionally designed to save Bristol $6.4 billion. At the very least, that

inference is *at least* "as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *see also In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 381, 394 n.176 (S.D.N.Y. 2007) ("highly unusual and suspicious facts" "add to the overall pleading of circumstantial evidence of fraud"); *In re BioMarin Pharm. Inc. Sec. Litig.*, No. 3:20-CV-06719, 2022 WL 164299 at *13 (N.D. Cal. Jan. 6, 2022) (scienter found where defendants "told the market that they had high confidence in [FDA] approval on the set timeline and had a good relationship with the FDA when in fact there were allegedly concrete warning signs otherwise").

When investigating a crime, detectives ask *cui bono*—to whom is it a benefit—when trying to figure out who committed the crime. These nine unusual occurrences benefitted Bristol to the tune of $6.4 billion. Nobody else benefitted from the delays. It is thus compelling—at the very least as compelling as any other explanation—that Bristol was also responsible for causing them.

> **b.** **The Complaint pleads actual knowledge by the Individual Defendants.**
>
> (1) Allegations regarding senior Bristol personnel's knowledge bolster the strong inference of scienter.

In developing and seeking approval of a new drug, a strong inference of scienter exists if "management knows that certain facts will necessarily prevent[] regulatory approval" but "conceals these facts from the investing public[.]" *In re*

*AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008); *see also Woods v. Maytag Co*., 807 F. Supp. 2d 112, 126 (E.D.N.Y. 2011) (defendants' "attempt to conceal the problem" indicated scienter). Similarly, there is scienter if "management is reckless in dealing with such adverse facts." *AstraZeneca*, 559 F. Supp. 2d at 470. Plaintiffs allege the Individual Defendants did exactly this by repeatedly touting the impending approval of Liso-cel without disclosing Bristol's grave missteps in the process, despite knowing (or at the very least recklessly failing to learn) about them.[3]

(a)  FDA Communications

As the District Court noted in its first opinion, allegations of recklessness are sufficient when plaintiffs have alleged defendants' knowledge of or access to information contradicting their public statements. JA-968 (citing *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)); *see also In re Alibaba Grp. Holding Ltd. Sec. Litig.*, No. 20-CV-9568, 2023 WL 2601472, at *13 (S.D.N.Y. Mar. 22, 2023) (finding a strong inference of scienter because defendants "would have known or had access to facts" in certain documents which were "contrary to its representations to investors"); *Set Cap. LLC*, 996 F.3d at 79 (that defendants "knew facts or had access to information suggesting that their public statements were not accurate" supports an inference of scienter).

---

[3] Here, the intent was merely to delay—not wholly prevent—approval.

Here, Plaintiffs establish such knowledge through particularized pleadings—based on internal FDA documents—that numerous senior Bristol executives, including Defendants Caforio, Arduini, Emmens, Paliwal, and Vousden, were in *direct communication* with the FDA regarding drug approval, and *knew* through both Bristol's FDA submissions and the direct communications from the FDA that Bristol submitted a wholly inadequate BLA, that the FDA issued a Major Amendment determination, and, through the Form 483s and Bristol's inadequate responses thereto, that the Liso-cel facilities were woefully and inexplicably ill-prepared for FDA inspection.   JA-1001.

Indeed, the communication between the FDA and Bristol was extensive during the approval process, with letters from the FDA being sent to as many as *forty* Bristol employees, and multiple meetings between the FDA's CBER and Bristol attended by dozens of Bristol employees throughout the relevant time.  *Id.*  Bristol's VP of Cell Therapy Development and Operations Quality, Maria Brown, was present for the "closing meeting" with the FDA, wherein she was notified of the inspection failures at Bristol's facilities.  JA-1003; *see also infra* § A(1)(c).

Bristol, through its most senior executives, thus knew of its inadequate FDA submissions and facility inspections failures, which made clear that Liso-cel was highly unlikely to be approved by the deadline and that Bristol's efforts to secure that approval were anything but "diligent."

(b)     Bristol Committees

Corporate committee membership can support an inference of scienter regarding the information within that committee's jurisdiction.  *See, e.g.*, *In re Peabody Energy Corp. Sec. Litig.*, No. 20-CV-8024, 2022 WL 671222, at *22 (S.D.N.Y. Mar. 7, 2022) (imputing scienter of smoke and fire at mining site because corporate defendant had assembled a task force regarding the site); *Venkataraman v. Kandi Techs. Grp., Inc.*, No. 20-CV-8082, 2022 WL 4225562, at *7 (S.D.N.Y. Sept. 13, 2022) (imputing scienter to individual defendants because of their presence at audit committee meeting); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13-CV-214, 2014 WL 285103, at *5 (S.D.N.Y. Jan. 27, 2014) (scienter sufficiently alleged against audit committee members because committee failed to act in response to red flags); *In re Converse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 144–45 (E.D.N.Y. 2008) (imputing scienter in part based on audit committee members' "likely experience and knowledge").

Various Individual Defendants served on Board-level committees that reported directly to the entire Bristol Board of Directors and were specifically tasked with overseeing the integration of the Celgene drugs, ***including Liso-cel***, within Bristol.  These individuals' service on these committees required them to obtain information regarding where Liso-cel was in the FDA approval process, what

23

information had been submitted to the FDA, and any feedback received from the FDA regarding Bristol's submissions.

For example, Bristol's Integration Committee—on which Defendants Caforio, Arduini, Emmens, Paliwal, and Vousden sat—was responsible for overseeing "*all aspects of the Celgene integration*" including "*integrating Celgene's pipeline and monitoring portfolio prioritization and execution*" of that pipeline and providing "*regular reports to the Board on the progress of the Merger integration*[.]" JA-1056. That Committee met *nine times* between 2019 and 2020.

Similarly, Bristol's Science & Technology Committee—on which Defendants Sato, Arduini, Emmens, and Vousden sat—was responsible for overseeing Bristol's "pipeline of new pharmaceuticals." JA-1055. Among its responsibilities were "*overseeing* and *regularly reviewing* Bristol's pipeline" and "advising Bristol's Board [including Defendant Caforio] on the Company's *progress* in achieving near-term and long-term [research and development] goals[.]" JA-1055. That Committee met *twenty times* between 2019 and 2020.

Plaintiffs' allegations regarding these committees and the extensive involvement of high-level officers in the approval process and communicating with the FDA over Liso-cel demonstrates the knowledge the Individual Defendants had and/or the access they had to information contradicting Bristol's public statements.

(c)    Confidential Witness and Expert Allegations

24

Allegations from multiple confidential witnesses that defendants had knowledge of a fact further supports a strong inference of scienter. *See, e.g.*, *Freudenberg v. E\*Trade Financial Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010) (corroboration from multiple confidential witnesses "supports an inference of a scienter"); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 301 (S.D.N.Y. 2018) (same).

Here, Plaintiffs' allegations include confirmation from multiple former Bristol employees that the Individual Defendants were regularly updated and informed during the Liso-cel approval process. CW #9, who contributed updates to senior management at the relevant time, confirmed that senior leadership, including Defendant Caforio, **were "*aware*** of underlying issues regarding the FDA approval process for Liso-cel" because they "***were included*** as part of the [FDA] communication updates[,]" and with a "high degree of frequency" were provided with "Liso-cel program updates." JA-1054 (emphases added). CW #9 also confirmed Bristol management gave "priority attention" to Liso-cel's approval. *Id.* CW #10, an executive in Bristol's quality department, confirmed Caforio "should have been apprised of the situation" and "should have known about all such FDA communications." JA-1003. These additional allegations further support an inference that the Individual Defendants knew, or at least were reckless in not knowing, of Bristol's repeated missteps in the FDA approval process.

The Complaint includes allegations from the FDA Biologics Expert which further support that inference. *See, e.g.*, JA-1029 (because the CMC "is the most important section of the BLA," "a pharmaceutical giant like Bristol normally would have filed [it] immediately following the closing of the Merger"); 997 ("any pharmaceutical executive who worked on submitting biologics . . . would have known that it was incredibly important for the BLA application to contain all the required data and information, not simply summaries"); 1004 ("No one, much less an experienced drug company like Bristol, would ever have omitted such key information"); 1032 ("[The] 23-day delay in providing the missing [CMC data] to the FDA was[] 'highly unusual,' because a company at this stage of the BLA process would almost certainly have already had the necessary data and be[en] able to immediately submit it."); JA-1034, 1046-47 (noting the inspection-related errors "should not have been made" for "an experienced company like Bristol with licensed biologic products").

### (d)    Bristol Executives' Representations

An executive's speaking on a particular subject supports an inference that that executive had or should have had knowledge of the information underlying said subject. *See, e.g.*, *In re Romeo Power Inc. Securities Litig.*, No. 21-CV-3362, 2022 WL 1806303, at *4–5 (S.D.N.Y. June 2, 2022) (imputing scienter where executives spoke about battery supply because of "the importance of battery cells and [the

executives'] comments on supplies"); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008) (statement about one investor's commitment to a fund sufficient to impute scienter of the overall undercapitalization of the fund); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 472–73 (S.D.N.Y. 2013) (finding knowledge of undisclosed equity incentive compensation plan sufficiently pled based on defendants' omissions and denials about the plan, including public filings, press releases, presentations, and statement). *See also Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 611 (4th Cir. 2015) (scienter inquiry necessarily involves consideration of "the context of the statements that a defendant affirmatively made").

Here, Bristol's executives regularly spoke in detail about the state of the Liso-cel approval process. For example, in the weeks leading up to the Merger, Defendants Caforio and Hirawat emphasized to investors that approval of Liso-cel was on track and that executives and Board members were committed to achieving timely approval of the drugs before their respective milestone dates. JA-1047, 1052. Because the Exchange Act Defendants elected to speak about where Bristol was in the Liso-cel approval process, asserted that they *personally knew* that Bristol was "on track" for Liso-cel to be approved prior to the Milestone Date, and conceded that they were *personally* involved and "committed" to "timely approval" of Liso-cel before its Milestone Date, the District Court should have inferred that they either

knew or were reckless in not informing themselves about the specifics of the FDA's approval process for Liso-cel, including the timing and substance of Bristol's FDA submissions and any FDA feedback thereto, which made clear that Bristol was neither "on track" for nor "committed" to approval before the Milestone Date.

This point is further bolstered by Plaintiffs' allegations regarding the Guggenheim Partners report. Defendants Caforio and Bancroft told analysts from Guggenheim Partners, an investment firm, that "oversight of the CVR is a *board-level responsibility[.]*" JA-1027, 1053, 1072. This allegation *specifically* implicates Caforio and Bancroft, despite the District Court's express finding to the contrary in its first order. *See* JA-972 ("generalized allegations about . . . management [that do] not implicat[e] any of the named Defendants . . . are insufficient to support an inference of scienter.").

These allegations—the aberrational nature of Bristol's delays, the involvement of high-level executives, including the Individual Defendants, in communicating with the FDA, the organizational structure of Bristol's committees (and Individual Defendants' memberships thereon), the allegations of CWs and the FDA Biologics Expert, and the fact that Bristol's executives themselves elected to regularly speak on the Liso-cel approval process—taken separately, and *certainly when taken holistically*, adequately support an inference that the Individual

28

Defendants knew or were reckless in not knowing that their representations about Liso-cel's approval were misleading.

> (2) The District Court erred in finding individual scienter not adequately pled.

>> (a) The District Court erred by finding alternative inferences of "mismanagement" and COVID-19 more compelling

The Court concluded in its first order that "[i]n the final analysis, the Liso-cell [*sic*] setbacks are more attributable to corporate (or government agency) 'mismanagement,' which does not, by itself, give rise to a strong inference of scienter." JA-975. This conclusion is contradicted by the well pled allegations.

Rather, as the FDA Biologics Expert repeatedly noted, and numerous confidential witnesses confirmed, Bristol's deluge of failures is far too obvious, unusual, and atypical for a company of Bristol's experience to be attributed to mere unintentional mismanagement. *See, e.g.*, JA-996 (delay in filing CMC "unjustifiable and highly unusual"); JA-1005 (accidentally submitting a woefully deficient CMC is "implausible"); JA-1006 ("Bristol's eleven-month approval timeline for Liso-cel is a statistical anomaly when weighed against … comparators."); JA-1032 (twenty-three day delay in submitting amendment was "highly unusual"); JA-1035-36, 1040-41 (inspection deficiencies were "unusual and avoidable" and violations were "glaring"); JA-1036-37 (Form 483 response was "obviously inadequate"); JA-1037 (two-month gap between the inspection and the final Form 483 response is "unheard

of"); JA-1037-38 (sending inexperienced staff member to prepare facility for inspection was "shocking").

Moreover, even claims involving mismanagement are properly brought under Section 10(b) when the statements made by a company and/or its executives about issues concerning the management of its product or business operations are false or misleading. *See, e.g.*, *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 396 (S.D.N.Y. 2022) ("[t]he federal securities laws prohibit misrepresentation of material facts, even when those material facts relate to corporate mismanagement"); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*, 423 F. Supp. 2d 348, 355 (S.D.N.Y. 2006) (same); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 27 (S.D.N.Y. 2004) ("a failure to disclose facts that amount to mismanagement may render other statements misleading"). Here, Plaintiffs alleged an element of deception: despite their repeated comments on the FDA approval process of Liso-cel, Bristol never notified the public that the delays were the result of its own, avoidable misconduct, that it was not using "diligent efforts" to obtain timely approval, and that it did not intend to obtain approval before the deadline.

The District Court committed further error by finding—in direct contravention to Plaintiffs' allegations—that Bristol's missteps were more attributable to the COVID-19 pandemic than conscious or reckless misconduct. First, even in the initial complaint, Plaintiffs alleged at length that, even during the

30

pandemic, no other comparable drug in recent memory had experienced such avoidable delays in the FDA approval process, including all other Bristol and Celgene drugs approved in the past eight years, suggesting Bristol is perfectly competent at securing timely approval when it wants. JA-1060-63. From these well pled allegations, the District Court drew three erroneous conclusions.

First, it found that Plaintiffs' allegations "overlook[] the fact that the FDA *did* approve Liso-cel during the pandemic and only a few weeks after its target approval date." JA-974. But this fact ***bolsters rather than undermines Plaintiffs' theory of liability***: as alleged in the Complaint, the fact that Bristol received FDA approval shortly after the all-or-nothing Milestone Date supports the conclusion that the only impetus for the delays was to *miss* that very deadline.

Second, it reasoned that "without knowing the particulars of the other drugs approved by the FDA during the pandemic, it is impossible to know whether Plaintiffs are comparing apples and apples or apples and oranges." JA-974-75. Plaintiffs specifically addressed this concern in their renewed Complaint by including allegations that the FDA approved several drugs that are "apples-to-apples" comparators to Liso-cel. JA-1005-06. According to the FDA Biologics Expert, under that apples-to-apples comparison, the approval timeline for Liso-cel was a *statistical anomaly*, *even accounting for the complexity of its approval process and an unprecedented global pandemic*. JA-1005-06. Yet the Court did not deal

31

with these new allegations or deviate from its initial conclusion about these comparisons.

Third, the District Court found "the fact that the FDA approved other drugs during the pandemic says nothing about whether BMS's alleged missteps were attributable in part to the pandemic," and "how the FDA handled other approvals during the pandemic has no bearing on Defendants' actions and knowledge — Defendants did not determine the FDA's priorities and how it should deploy its resources during the pandemic." JA-975. But, as discussed below, that is exactly the point Plaintiffs and the Expert made: the FDA operated within a general range of efficiency during the pandemic. The only reason the FDA approval process was statistically longer for Liso-cel was because of **Defendants'** repeated failures, described above, *supra* § A(1)(a), not some unidentified FDA delay attributable to the pandemic.

That Bristol would likely not obtain FDA approval for Liso-cel before the Milestone Date was known by Defendants as early as December 18, 2019—**before the COVID-19 pandemic even began**—as a result of Bristol's inexplicable failure to submit a proper CMC with its BLA. JA-997-99. Compounding this obviously deficient filing, Bristol then unjustifiably and highly unusually waited three months before submitting the CMC portion of the BLA on April 15, 2020. JA-998-99. Even more unexplainable, even though the CMC submission is "**the most important**

section of the BLA," is that Bristol submitted a wholly inadequate CMC which included only "summaries" of key tests, which the FDA promptly determined were "*inadequate to understand and assess control of the analytical procedures and respective validations.*" JA-996-98. COVID-19 cannot explain these intentional delays or how one of the most sophisticated drug companies in the world repeatedly made inexplicable errors in routine and critically important FDA submissions.

It was *Defendants'* failure to file an adequate CMC submission and failure to quickly remedy that error that caused the delay, *not* the FDA.

Other allegations further confirm that the delays in the approval of Liso-cel cannot be explained away by COVID-19. For example, Bristol failed to prepare its facilities for inspection for reasons "wholly unrelated to the global pandemic[,]" such as preventing mold and using the right kind of disinfectants. JA-1059-60. Similarly, CW #10, an executive in the quality department of Celgene/Bristol, made clear that Bristol "cannot blame the delay of approval of Liso-cel on COVID-19 alone[.]" JA-1059.[4] If anything, the Exchange Act Defendants' statements about the impact of the COVID-19 pandemic on the Liso-cel approval timeline were an

---

[4] This Court noted in its prior opinion that "the FDA did approve Liso-cel during the pandemic and only a few weeks after its target approval date," JA-974, but that *supports* Plaintiffs' theory of this case, which is that Bristol intentionally or recklessly delayed the approval of Liso-cel *just enough* to avoid paying out investors while maximizing profits to Bristol from its subsequent sales of Liso-cel. *See, e.g.*, JA-988, 990, 1006, 1057.

33

attempt to conceal their fraud, and thus **probative** of scienter. *Cf. BioMarin*, 2022 WL 164299, at *11 n.7 (disregarding, at the motion to dismiss stage, defendants' "argument that COVID-19 caused the FDA's delay in the inspection").

Despite briefing on all of the above in the second round of motion to dismiss briefing, the Court did not address any of these concerns in its second order. JA-1192-93 ("[A]s the Court noted in dismissing the First Amended Complaint, 'how the FDA handled other approvals during the pandemic has no bearing on Defendants' actions and knowledge — Defendants did not determine the FDA's priorities and how it should deploy its resources during the pandemic.' Thus, allegations of this nature ... more likely support an inference of corporate (or government agency) 'mismanagement,' which is insufficient."). Failure to address these arguments—some of which were based on allegations specifically added to address the District Court's previous opinion—was error.

(b)      The District Court erred in finding a strong inference of scienter was not alleged

***First***, the District Court erred in its first order by dismissing Plaintiffs' argument that the Individual Defendants' repeated speaking on the Liso-cel approval as evidence of scienter as simply "circular." JA-972. By speaking about the Liso-cel approval process, the Individual Defendants assumed a duty to be informed about that topic and to speak accurately and completely. Thus, because Bristol's executives spoke about the Liso-cel approval process, the District Court should have

34

reasonably inferred, as other courts in the Southern District of New York repeatedly have, that they **knew** about it or were reckless in not knowing. *See In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, at *4–5; *Goldin Restructuring Fund*, 590 F. Supp. 2d at 622; *CNinsure Inc.*, 951 F. Supp. 2d at 472–73.[5]

*Second*, the District Court erred in dismissing in its second order Plaintiffs' allegations regarding Bristol's committees (and Defendants' membership thereon) by stating only that "'[m]ere membership in a committee with oversight responsibilities,' which is all that Plaintiffs allege, 'is not enough to give rise to an inference of recklessness.'" JA-1189. That characterization ignores the detailed allegations concerning the responsibilities of those committees and their necessary receipt of and access to information contrary to the Exchange Act Defendants' representations to investors.

The opinions the District Court cited in support of this position are easily distinguished from this case. For example, in *Refco*, plaintiffs' **sole** basis for alleging scienter for the audit committee defendants was their membership on the committee

---

[5] The District Court cited *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d at 1, 24 (S.D.N.Y. 2016) to support its rejection of this argument, but in that same opinion, the *Lions Gate* court noted that "if one chooses to speak on a subject, 'one must speak truthfully about material issues. ... [A company] ha[s] a duty to be both accurate and complete.'" *Id.* at 15 (citing *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002).

Moreover, the holding of *Lions Gate* has since been understood to alleviate corporations of the need to disclose mere *possibilities* of adverse events. *See, e.g.*, *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 n.8 (2d Cir. 2016). Here, Plaintiffs allege Defendants knew, given their failure to submit things timely and accurately or fix the issues at the inspection facilities, that they would miss the Milestone Date.

where, here, the membership allegations combine with a variety of other allegations supporting the Exchange Act Defendants' scienter. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007). *Africa v. Jianpu Tech. Inc.* is similarly distinguishable. No. 21-CV-1419 (JMF), 2022 WL 4537973, at *11 (S.D.N.Y. Sept. 28, 2022). There, the committee and the defendants were one step removed from each other: while the *Africa* plaintiff alleged the committee had information supportive of a finding of scienter, the defendants in that case were *board members*, *not* members of the audit committee that received or had access to the relevant information.

*Third,* the District Court erred in concluding in its second order that Plaintiffs' "allegations do not support [their] assertion 'that numerous senior Bristol executives,' including Dr. Caforio, 'were in *direct communication* with the FDA regarding the Liso-cel approval process'" because the FDA inspection warning letters regularly addressed to Defendant Caforio "pertain[ed] to an entirely unrelated inspection." JA-1190. But, at this stage, Plaintiffs are not required to *prove* Defendant Caforio—or any other Defendant—had actual knowledge of Bristol's missteps, but only that an inference that they had such knowledge is as compelling as any other. Thus, Plaintiffs' allegation that Caforio regularly received inspection warning letters from the FDA—when considered as part of a *holistic* analysis of Plaintiffs' allegations—bolsters a finding of scienter.

The same applies to the District Court's disregard of Plaintiffs' allegations that "letters exchanged between the FDA and Bristol . . . cc'ed as many as *forty* individuals at Bristol, including senior executives from Global Regulatory Sciences, Global Risk Management, Global Drug Development, and Global Development Operations," or that "*dozens* of Bristol employees attended the March and September 2020 meetings with the [CBER] relating to the approval process" because they are not tied "to any Defendant." JA-1190-91. Here, too, Plaintiffs' allegation that forty top senior individuals were included in FDA communications underscores an inference that Bristol took those communications very seriously, and thus that the Individual Defendants would have been apprised of updates regarding the approval of Liso-cel. As explained below, such allegations are also probative of corporate scienter, *see infra* § A(1)(c), though the District Court did not take them as such.

**Fourth**, the District Court erred in its first order in its assessment of Plaintiffs' CWs' and FDA Biologics Expert's allegations regarding scienter, as the District Court improperly focused on whether the CWs or FDA Biologics Expert had *direct* knowledge of Defendants' actual knowledge.[6] JA-972 ("The confidential witnesses shed no light on the scienter of the Executive Defendants; indeed, none of them are

---

[6] Despite the District Court's conclusion otherwise in its second order, CW #9's allegations do constitute *direct* evidence of Bristol's scienter. *Compare* JA-1003-04, 1054 ("Liso-cel program updates were shared with a high degree of frequency to senior leadership, including at times to CEO Caforio.") *with* JA-1192 ("the allegations from CW #9 … fall far short of providing that the individual Defendants knew or should have known that their statements were false or misleading").

alleged to have ever interacted with any Executive Defendant regarding Liso-cel");
JA-973 ("The FDA Biologics Expert['s allegations] that certain FDA requirements
'would have been familiar … well known … [and] familiar to [Bristol]' … are not
relevant to the Executive Defendants' knowledge[.]").[7]  The proper analysis is to
consider the CW allegations—whether they allege a direct *or* circumstantial basis
for inferring scienter—*along with* the other allegations of scienter and consider them
holistically.[8]

### c.  The Complaint adequately pleads corporate scienter of Bristol.

"[S]ecurities fraud claims typically have sufficed to state a claim based on
recklessness when they have specifically alleged defendants' knowledge of facts or
access to information contradicting their public statements."  *Setzer v. Omega
Healthcare Invs., Inc.*, 968 F.3d 204, 215 (2d Cir. 2020) (quoting *Novak*, 216 F.3d
at 308)).  "Where a defendant is a corporation, a plaintiff can plead corporate scienter
by alleging 'facts that give rise to a strong inference that someone whose intent could

---

[7] While the District Court cited two cases for the proposition "that an expert may not opine on the
state of mind or knowledge of a party," JA-973, neither of those cases were pleading-stage
opinions involving a scienter analysis.  *See, e.g.*, *Anderson News, L.L.C. v. Am. Media, Inc.*, No.
09-CV-2227 (PAC), 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d 87 (2d
Cir. 2018); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 479 (S.D.N.Y. 2016).
Further, rather than opining on what the actual state of mind of any Defendant was in this matter,
rather, Plaintiffs' FDA Biologics Expert was merely substantiating what assumptions one could
make about the regular flow of information at a pharmaceutical conglomerate like Bristol.  The
District Court cited no authority suggesting that sort of opinion is impermissible.

[8] The District Court repeated this error in its second opinion.  *See* JA-1191-92.

be imputed to the corporation acted with the requisite scienter.'" *Nandkumar v. AstraZeneca PLC*, No. 22-2704-CV, 2023 WL 3477164, at *4 (2d Cir. May 16, 2023) (quoting *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020)). Here, Plaintiffs have done both.

The Second Circuit has identified three paths to adequately pleading corporate scienter. First, the "'most straightforward' way … is to impute it from an individual defendant who made the challenged misstatement." *Jackson*, 960 F.3d at 98. Second, a plaintiff can "plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015). Finally, when a statement is sufficiently "dramatic," collective corporate scienter may be inferred even where the individuals responsible for the fraudulent statement are not identified. *Jackson*, 960 F.3d at 98–99. The Complaint pleads corporate scienter in all three ways.

*First,* for the reasons stated above, Plaintiffs adequately plead corporate scienter because they adequately plead scienter individually for the Individual Defendants. *See supra* § A(1)(b).

39

**Second**, the Complaint successfully pleads corporate scienter for a second, independent reason: it specifically alleges that high-ranking corporate officials at Bristol, while they did not make the misrepresentations themselves, knew or should have known of the myriad of deliberate missteps by Bristol with respect to its Liso-cel approval process **and** that omitting those deliberate missteps made the statements at issue materially false and misleading. *See, e.g.*, *Loreley*, 797 F.3d at 177 (imputing scienter on corporations based on high-ranking individuals' scienter).

With respect to the defective and delayed filings with the FDA, the Complaint identified Bristol's (1) Vice President of Cell Therapy Development and Operations Quality, Maria Brown, (2) Chief Quality Officer and Senior Vice President of Global Quality, Jackie Elbonne, and (3) Senior Vice President of Global Regulatory Affairs, Jocelyn Seymour, as being directly involved in corresponding with the FDA about Liso-cel. JA-1004-1005. These three individuals, all senior executives at Bristol, directly corresponded with the FDA about Liso-cel and consequently knew about the undisclosed defective and delayed filings and that the statements about Liso-cel's approval process were consequently materially false and misleading.

Plaintiffs also levy several allegations regarding the undisclosed problems with the Liso-cel manufacturing sites which, after the acquisition, Bristol publicly described as "launch ready." JA-1034, 1047.

For one, Snehal Patel, the Vice President of the Global Manufacturing Network and Site Head at the Juno factory, assured the public that Bristol was conducting mock pre-approval inspections of its Liso-cel sites. JA-1047. The Complaint also alleges that Patel was an integral person in the preparation and inspection of the Juno facility and listed as one of the "top officials" in the FDA's Juno inspection report. JA-1040-41. He was present for the opening meeting with the FDA and was described as "[a]ccountable for building, leading, and optimizing the operations of the global cell therapy manufacturing network." *Id.*. This same Mr. Patel publicly acknowledged that Bristol was suffering from "self-inflicted wounds." *Id.*

For another, in addition to being involved in the FDA submission process, Maria Brown took part in the critical "closing meeting" with the FDA concerning the FDA issuance of Form 483 Inspection Reports for the Liso-cel manufacturing facilities, which found multiple violations of FDA requirements. JA-1003. That meeting, a standard but significant step in the CBER approval process, would have covered ***all*** of the deficiencies relating to Liso-cel manufacturing plants, of which Brown would have accordingly been apprised. JA-1003.

In other words, Patel and Brown—high-ranking Bristol executives—knew about the problems with the Juno facility and that the statements with respect to the Liso-cel approval process were false and misleading.

41

Under Second Circuit precedent, establishing scienter for people in the positions of Maria Brown, Jackie Elbonne, Jocelyn Seymour, and Snehal Patel is sufficient to plead corporate scienter. In *Loreley*, the Second Circuit imputed the requisite scienter to Wachovia based on allegations that one of Wachovia's managing directors knew about an omitted fact that rendered certain representations in an offering document materially false and misleading. 797 F.3d at 177-78. In investment banking, the title of managing director is a senior one, but one held by a relatively large number of executives. For instance, in 2023 alone, Goldman Sachs promoted 608 executives to managing director positions; in 2021 alone, Goldman Sachs promoted 643 executives to that rank.[9] Maria Brown, Jackie Elbonne, Jocelyn Seymour and Snehal Patel all held positions more senior than the managing director role at Wachovia that the Second Circuit found sufficient to allege corporate scienter in *Loreley*. *See also Schwab v. E*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 435 (S.D.N.Y. 2017) ("[C]ourts have readily attributed the scienter of management-level employees to corporate defendants."); *In re VEON Ltd. Sec. Litig.*, No. 15-cv-08672 (ALC), 2017 WL 4162342, at *10 (S.D.N.Y. Sept. 19, 2017) (imputing scienter of corporate executives to company in case alleging misleading financial statements due to bribery scheme, despite the lack of any allegation "that the executives with

---

[9] Saeed Azhar, *Goldman Sachs to promote 608 to managing directors, down from 2021* (Nov. 3, 2023, 7:57 AM), https://www.reuters.com/business/finance/goldman-sachs-promote-608-managing-directors-down-2021-2023-11-02/.

knowledge of the bribery had any role in financial reporting"); *In re BISYS Sec. Litig.*, 397 F.Supp.2d 430, 443 (S.D.N.Y. 2005) (imputing knowledge of regional vice president and vice president of department to corporate defendant); *In re JP Morgan Chase Sec. Litig.*, 363 F.Supp.2d 595, 627 (S.D.N.Y. 2005) (similar).

The District Court ignored these allegations in its first order and instead focused myopically on the allegations with respect to the Individual Defendants. *See, e.g.*, JA-971 ("[T]he relevant question is whether the allegations in the Complaint support an inference that *the Executive Defendants* knew (or should have known) of the alleged missteps.") (emphases removed and added). Specifically, the District Court held that the Complaint failed to adequately plead scienter because Plaintiffs did not "identify even one instance in which an *Executive Defendant* is alleged to have knowledge of one of the purported missteps"—specifically the "delays in filing and supplementing information with the FDA and not adequately preparing the two Liso-cel manufacturing facilities for their inspections." *Id.* (emphasis added). While the District Court's assertion with respect to the Individual Defendants is factually wrong for the reasons discussed above, *see supra* § A(1)(a)-(b), its analysis is also legally wrong in that it ignores that claims against *Bristol* should survive a motion to dismiss where, as here, high ranking executives knew about the Liso-cel missteps. The District Court ignored those allegations in its analysis of corporate scienter and instead merely stated—without any analysis—that

the Complaint "fail[s] to 'create a strong inference either (1) that someone whose intent could be imputed to [BMS] acted with the requisite scienter or (2) that the [alleged misstatements] would have been approved by corporate officials sufficiently knowledgeable about [BMS] to know that those statements were misleading.'" JA-975.

Given the allegations in the Complaint about Maria Brown, Jackie Elbonne, Jocelyn Seymour and Snehal Patel, this is reversible error.

***Third***, while admittedly "exceedingly rare," courts in this Circuit have held that misrepresentations involving enormous amounts of money and major schemes are so important that knowledge can be imputed generally to the company. *See, e.g.*, *In re Teva Sec. Litig.,* 671 F. Supp. 3d 147, 215 (D. Conn. 2023) (general corporate scienter inferred with respect to illegal off-label marketing of opioids because "the allegations set forth a claim of a widespread company strategy"); *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 574 (S.D.N.Y. 2010) (inferring corporate scienter where company failed to disclose an $8.1 billion exposure to collateralized debt obligations);[10] *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 299-300 (S.D.N.Y. 2009) (inference of corporate scienter where a company misrepresented

---

[10] The *MBIA* court also noted that allegations that the defendant company "repeatedly" uttered misrepresentations further support a finding of corporate scienter. *MBIA, Inc.*, 700 F. Supp. 2d at 591, 592. So too here. *See* JA-1069-93.

$4.4 billion in capital costs). This $6.4 billion fraudulent slow-down of the Liso-cel approval process is of a similar magnitude and deserves similar treatment.

### 2. Plaintiffs adequately pled evidence of motive and opportunity.

Motive is adequately pled where, as here, plaintiffs allege that defendants stood to receive "concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000).[11] At the pleading stage, the bar for pleading motive is not especially demanding, as courts in this Circuit need look only for "the barest of all pleading that would be acceptable" so as to avoid "tak[ing] this issue of fact from the finder of fact." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). "Insufficient, general motives include '(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation,' as well as other alleged motives that 'merely charge

---

[11] The "opportunity" prong of the "motive and opportunity" method of pleading scienter is readily satisfied where, as here, allegations of wrongdoing are levied against high-level corporate officials. *See, e.g.*, *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 813 (2d Cir. 1996) (indisputable that key directors and officers have ability to manipulate their company's stock price).

that executives aim to prolong the benefits of the positions they hold.'" *Rotunno v. Wood*, No. 22-502, 2022 WL 14997930, at *2 (2d Cir. Oct. 27, 2022).

The Exchange Act Defendants' motive to delay approval of Liso-cel was to avoid the unusual ***$6.4 billion payout*** by Bristol to the CVR holders. The size of this avoided payout—both in absolute terms, but also in terms of its significance to the Company—is staggering. This payout represents nearly as much as Bristol's ***entire*** $7.0 billion in net earnings in 2021, following a year in which Bristol lost $9.0 billion. JA-1067, 1097. Not paying the $6.4 billion to CVR holders had the added concrete benefit of allowing Bristol to pay down $4 billion of debt earlier than scheduled. JA-1068. This enormous amount of money alone is indicative of scienter. *See, e.g.*, *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) ("Simply put, the [$50-70 million] magnitude of the aftershock suggests more than a careless mistake or trivial miscalculation by Lexmark and its executives."); *Katz v. Image Innovations Holdings, Inc.*, 542 F.Supp.2d 269, 273 (S.D.N.Y. 2008) (holding, in $6 million fraud case, that the "magnitude of the [] fraud" may "provide[ ] some additional circumstantial evidence of scienter.").

Moreover, Bristol and Caforio created the unusual all-or-nothing structure themselves, ***insisting*** during the merger negotiations with Celgene on the unusual provision to trigger the CVR that would allow them to generate enormous benefits

by missing the Liso-cel deadline. This deliberate structuring of a mechanism conditioned on an event that Bristol could unilaterally delay to allow for an opportunity for a massive gain due to fraud also goes to motive and opportunity. *Set Cap.*, 996 F.3d at 81 ("the structure of the XIV Notes, which would allow Credit Suisse to profit [millions] if the value of the notes collapsed, provided both motive and opportunity for Credit Suisse to manipulate the market").

Defendant Caforio's motivation to engage in this scheme was also unusual. As alleged in the Complaint, Bristol's financial performance had been poor, its stock had been dropping precipitously, and Caforio and the rest of Bristol's leadership were in danger of being fired if Bristol's performance did not improve dramatically. JA-1024-25, 1064 (Bristol stock price had dropped nearly 30% from the time Caforio took over as CEO until the Celgene merger occurred).

Furthermore, despite the District Court's conclusion otherwise, the trading decisions of Bristol and the Individual Defendants are ***consistent*** with an expectation that Liso-cel would miss its deadline and then get approved shortly thereafter. This case concerns artificial inflation of the ***CVRs*** (which Defendants did not own), not Bristol's common stock (which Defendants did own). Because the Individual Defendants knew that Bristol's stock would become more valuable when the CVRs expired at the end of the Class Period (as noted, the stock price increased in the two weeks after the Class Period when the CVRs expired worthless), they were

47

incentivized to hold, not sell, their common Bristol shares. JA-1068, 1097. Finally, the Individual Defendants chose not to purchase CVRs in the open market which were trading at a substantial discount to the pay-out amount. JA-1097-98. Plaintiffs alleged the Individual Defendants made this choice because they knew that the Liso-cel deadline would be blown and thus the CVR's would expire worthless. JA-1028.

As described, the motives alleged here are not merely a "general" motive to make Bristol appear profitable or a desire to keep stock prices high to increase officer compensation, and are hardly the kinds of goals that are possessed by "***virtually all*** corporate insiders," as suggested by the District Court in its second order. JA-968 (citing *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009)) (emphasis added).

Moreover, the District Court erred in finding that "Plaintiffs' contention that Defendants were motivated to breach BMS's obligations in order to avoid the $6.4 billion CVR payments 'defies economic reason[]' … because any failure to secure timely FDA approval was certain to trigger a lawsuit seeking equivalent damages for breach of the CVR agreement[.]" *Id.*. This reasoning flies in the face of on-point precedent from the Second Circuit, which has rejected this same argument out of hand. *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 221 (2d Cir. 2000) (rejecting district court's reasoning that scienter was not alleged because it was "highly unlikely that E & Y would deliberately jeopardize its priceless reputation

and expose itself to expensive and potentially disastrous litigation"). It would also be dangerous for this reasoning—which is wholly unsupported by authority—to be allowed to stand. According to the District Court, the fact that illegal activity could expose a defendant to negative consequences—such as legal liability and costly legal fees—implies a defendant did not act with scienter. If accepted, this reasoning would immunize corporate defendants from all claims of securities fraud under the Exchange Act—and practically *any* type of white-collar crime, for that matter—because *any* illegal corporate activity could expose a corporate defendant to damages and costly legal fees. Put simply, the fact that securities fraud can lead to negative consequences does not imply that nobody ever commits securities fraud.

In reasoning otherwise, the District Court also ignored the possibility that Defendants believed that they could get away with the fraud. (Ironically, of course, the District Court illustrated the very real possibility that this could happen by dismissing Plaintiffs' claims against them in this matter.) Moreover, as a matter of simple economics, it makes perfect sense that Defendants would have engaged in the alleged misconduct: so long as any ensuing litigation settled for less than $6.4 billion—which it was reasonable to assume was very likely, as only a handful of securities cases have settled for such a staggering amount—Defendants would come out ahead financially, making it worth it to engage in the fraud.

The District Court also erred (when it categorized this as a "core operations" argument) by noting in its first order, first, that core operations allegations are "supplementary," not "independently sufficient means to plead scienter." JA-973-74. As explained throughout this brief, Plaintiffs do not rely solely on a core operations argument to establish scienter. Second, the District Court observed that, in any event, "[w]hen applying the [core operations] doctrine, courts have required that the operation in question constitute nearly all of a company's business before finding scienter." *Id.* The Complaint meets this standard: by avoiding the $6.4 billion CVR payout, ***Bristol increased its net earnings in 2021 from $600 million to $7 billion***. JA-1064. In other words, nearly all of Bristol's business—***91% of its annual net earnings***—can be attributed to Bristol's successfully avoiding the CVR deadline. This raises it to the level of a "core operation." *See, e.g.*, *Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 398-399 (Furman, J.) (S.D.N.Y. 2022) (suggesting ***91%*** of company revenue would satisfy core operations doctrine if shown to come from the source at issue).

## B.    Securities Act Claims.

The Securities Act Defendants, in the Registration Statement and Joint Proxy, made, *inter alia*, the following statements:

- Bristol Myers Squibb has agreed to use "diligent efforts" to achieve the CVR milestone. JA-1070-71.

- There is also uncertainty regarding the fair market value of the CVRs and whether any payment will ultimately be realized on the CVRs. JA-1072.[12]

Plaintiffs alleged that these statements were false and misleading when made because they "**omitted** that Bristol intended to slow-roll the FDA application process for Liso-cel and Ide-cel so that they would miss at least one FDA milestone and avoid making the $9 CVR payment." JA-1072 (emphasis added). The District Court held these misstatements were not actionable under the Securities Act because they are covered by the PSLRA's safe harbor as they are forward looking statements identified and accompanied by meaningful cautionary language. JA-977-78. The District Court is wrong for three reasons: the misstatements at issue are (1) **omissions** and thus are not protected by the PSLRA's safe harbor; (2) not forward looking; and (3) not accompanied by meaningful cautionary language.

### 1. The omissions at issue are not protected by the PSLRA's safe harbor provision.

"[C]ourts in the Second Circuit have consistently held that 'the PSLRA safe harbor [provision] ... [does not] protect [ ] material omissions.'" *Galestan*, 348 F. Supp. 3d at 304 (citing *Wilson v. LSB Indus., Inc.*, No. 15-Civ-7614, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017)). *See also Bisel v. Acasti Pharma, Inc.*, No.

---

[12] In its first order, the District Court mischaracterized Plaintiffs' reliance on the Guggenheim Partners analyst report as supportive, in part, of Plaintiffs' Securities Act claims. *See* JA-981. As explained above, that report is probative of *scienter* under the Exchange Act claims. *See supra* at 21.

21 CIV. 6051 (KPF), 2022 WL 4538173, at *8 (S.D.N.Y. Sept. 28, 2022) ("Courts in the Second Circuit 'have consistently held that neither the PSLRA safe harbor, nor the bespeaks-caution doctrine protects material omissions'"); *Rudani v. Ideanomics, Inc.*, No. 19 CIV. 6741 (GBD), 2020 WL 5770356, at *6 (S.D.N.Y. Sept. 25, 2020) (same); *Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 83 (D. Conn. 2019) (same), *In re Salix Pharms., Ltd.*, 14-CV-8925 (KMW), 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016) (same). The Fifth Circuit has taken a similar position. *See Heinze v. Tesco Corp.*, 971 F.3d 475, 483-84 (5th Cir. 2020) ("We agree with Heinze that the text of the safe harbor provision deals with forward-looking statements that were actually made rather than forward-looking statements that were omitted.").

The application of this principle by courts makes it clear that it applies here as well. For instance, in *Galestan* the court held that defendants' failure "to disclose problems and uncertainties, of which they had knowledge" constituted an omission that violated the Securities Act and to which the PSLRA's safe harbor provision could not apply. 348 F. Supp. 3d at 304. Similarly, in *Baum*, the Court held "the safe harbor would not protect defendants from liability for the proxy's failure to disclose the fact that the Management Projections did not account for acquisitions." 408 F. Supp. 3d at 83. Similarly, here, as alleged in the Complaint, the Securities Act Defendants "***omitted*** that Bristol intended to slow-roll the FDA application

process for Liso-cel and Ide-cel so that they would miss at least one FDA milestone and avoid making the $9 CVR payment." JA-1072 (emphasis added). This omission is not protected by the PSLRA's safe harbor provision. Accordingly, the District Court's decision dismissing Plaintiffs' claim on this ground should be reversed.

### 2. The misstatements at issue are not forward looking.

Whether the statements above are forward looking is an open question in this Circuit. In *In Re Philip Morris Int'l Inc. Sec. Litig.*, the investors argued that "defendants had already anticipated future events and failed to disclose their then-present awareness." 89 F.4th 408, 425–26 (2d Cir. 2023) (emphasis removed). That is the situation here: when the statements at issue were made, Defendants had the present intent, and awareness of that intent, to slow-roll the Liso-cel approval process so that Liso-cel would definitely miss the Milestone Date. Thus, when they suggested there was some chance of Liso-cel hitting its deadline, they knew there actually was not. The same goes for the "uncertainty" regarding the value of the CVRs—Defendants knew of the plan to deliberately miss the Liso-cel deadline, rendering it certain that the CVRs would ultimately prove valueless. Finally, when they committed to exercise "due diligence" to meet the Milestone Date for Liso-cel, Defendants had their metaphorical fingers crossed as they knew they would not, in fact, be diligent.

In *Philip Morris*, the Second Circuit did not decide the issue of first impression it identified, noting it "need not reach the parties' heady debate over the philosophy of language and time," as it found the statement at issue was "was not false at all – thus mooting the question of whether it qualifies as a forward-looking statement for purposes of the PSLRA's statutory safe harbor." *Id.* Here, however, the question of whether an undisclosed present intent and awareness about a future event qualifies as forward looking must be answered as this is the only ground upon which the District Court dismissed Plaintiffs' Securities Act claims. The closest analogous fact pattern comes from a recent decision in the Fifth Circuit. In *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 210–11 (5th Cir. 2023), the plaintiff contended the statement "right now, barring some other decision that's made, all our parks are progressing nicely towards their anticipated opening dates" referred to "then-present facts" rather than future predictions. The Fifth Circuit agreed, holding that while "the deadline is a future projection, the crux of Plaintiff's fraud claim is that Defendants misled investors about the Company's present construction progress. This is a mixed present/future statement ineligible for safe harbor protection." *Id.* (emphasis removed). So too here.

### 3. The statements at issue were not accompanied by meaningful cautionary language.

"To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247 (2d Cir. 2016). "'Vague' disclaimers are inadequate." *Id.* "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). "[D]efendants … carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor…." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770-73 (2d Cir. 2010).

Defendants offer instances of purportedly meaningful cautionary language, but none of them discuss the risk that Defendants planned to deliberately delay the FDA application process. The language in Bristol's Proxy Statement simply states that, "[i]f the CVR milestone … is not achieved *for any reason* … the CVRs will expire valueless." JA-201 (emphasis added). This catch-all warning is paradigmatic of a "vague disclaimer." Nowhere in the disclosure did Bristol warn investors that it was intending to miss the Milestone Date or that the CVRs *would indeed* expire valueless.

This is similar to *Vivendi*, where the Second Circuit held that a "kitchen-sink disclaimer, listing garden-variety business concerns that could affect any company's

financial well-being, was not meaningful cautionary language" that could keep the question out of the hands of a jury. *Vivendi*, 838 F.3d at 247. It is also analogous to a recent Ninth Circuit case which held that "broad pronouncements without meaningful acknowledgement of the known risks … does not suffice to invoke the safe harbor provision." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 951 (9th Cir. 2023); *see also In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 108 (D.C. Cir. 2015) (no safe harbor protection "based on a statement that risk could come to fruition where that risk has already begun to materialize"); *BioMarin*, 2022 WL 164299, at *8 (statement that "COVID-19 could postpone necessary interactions with regulators" and "delay review or approval" was insufficiently cautionary because it was not tailored to alleged misrepresentations regarding likelihood of approval by target date).

Consequently, the meaningful cautionary language prong remains unfulfilled and the District Court should be reversed.

## C.   Plaintiffs adequately pled the Section 14(a) and "Control Person" Claims.

In dismissing Plaintiffs' principal securities claims, the District Court also dismissed Plaintiffs' ancillary claims arising under Sections 14(a) and 20(a) of the Exchange Act and Section 15 of the Securities Act.

As explained above, because the statements at issue in Plaintiffs' Securities Act claims are not subject to the safe harbor provision, this Court should reinstate

Plaintiffs' Section 14(a) claims. Further, because this Court should reinstate Plaintiffs' primary Exchange Act and Securities Act claims (and Defendants do not dispute the Individual Defendants' control of Bristol), it should also reinstate Plaintiffs' controlling person claims. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

### D. In the alternative, Plaintiffs should be granted leave to amend their pleadings.

In the Second Circuit, leave to amend a complaint to address deficiencies identified by the court is to be "freely given[.]" *Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000). In general, "district courts should not deny leave unless there is a substantial reason to do so, such as excessive delay, prejudice to the opposing party, or futility." *Id.* (citing *Jones v. N.Y. Div. of Mil. & Naval Affs.*, 166 F.3d 45, 50 (2d Cir. 1999) (futility); *MacDraw, Inc. v. CIT Grp Equip. Fin., Inc.*, 157 F.3d 956, 962 (2d Cir. 1998) (delay or prejudice)). Here, the District Court erred in denying Plaintiffs' request that, if Defendants' motion be granted, it be granted without prejudice. In so doing, the District Court presumed that Plaintiffs had "received whatever documents they hoped to get in response to their FOIA requests," and thus leave would be futile. JA-1194. This is untrue: while some of the FOIA requests Plaintiffs referenced in their brief have been produced, *see* ECF No. 121 at 25 n.30, FOIA requests to the FDA are currently backlogged as far as two years, and Plaintiffs still have requests pending with CBER. That said, Plaintiffs

have also received confirmation from CBER that a production responsive to their requests should be expected within the next few months. Accordingly, the District Court erred by forbidding Plaintiffs from amending their Complaint upon receipt of those productions.

## CONCLUSION

For all the above reasons, the judgment of the District Court should be reversed.

Dated: May 24, 2024

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/ s / Michael B. Eisenkraft*
Michael B. Eisenkraft
Laura H. Posner
Benjamin F. Jackson
Brendan R. Schneiderman
88 Pine Street / 14th Floor
New York, New York 10005
Tel. (212) 838-0177
meisenkraft@cohenmilstein.com
lposner@cohenmilstein.com
bjackson@cohenmilstein.com
bschneiderman@cohenmilstein.com

Steven J. Toll
1100 New York Avenue N.W.
Fifth Floor
Washington, D.C. 20005
Tel. (202) 408-4600
stoll@cohenmilstein.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 13,316 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

Dated:      May 24, 2024      Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/ s / Michael B. Eisenkraft*
Michael B. Eisenkraft
Laura H. Posner
Benjamin F. Jackson
Brendan R. Schneiderman
88 Pine Street / 14th Floor
New York, New York 10005
Tel. (212) 838-0177
meisenkraft@cohenmilstein.com
lposner@cohenmilstein.com
bjackson@cohenmilstein.com
bschneiderman@cohenmilstein.com

Steven J. Toll
1100 New York Avenue N.W.
Fifth Floor
Washington, D.C. 20005
Tel. (202) 408-4600
stoll@cohenmilstein.com

# SPECIAL APPENDIX

## TABLE OF CONTENTS

PAGE

Opinion and Order of the Honorable Jesse M. Furman Appealed
From, dated February 29, 2024 .................................. SPA-1

Judgment Appealed From, dated February 29, 2024 ................. SPA-17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                                :
IN RE:                                   :              21-CV-8255 (JMF)
                                                  :
BRISTOL-MYERS SQUIBB COMPANY CVR         :      OPINION AND ORDER
SECURITIES LITIGATION                         :
                                                    :
------------------------------------------------------------------ X

JESSE M. FURMAN, United States District Judge:

       In this litigation, a consolidated putative class action brought on behalf of those who

purchased or otherwise acquired Contingent Value Rights ("CVRs") issued by Bristol-Myers

Squibb Company ("BMS" or "Bristol") as part of a merger, Plaintiffs alleged that Defendants —

BMS and current or former BMS executives and directors — violated the Securities Act of 1933,

the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange

Commission ("SEC") Rules promulgated thereunder.  In a prior Opinion and Order, familiarity

with which is presumed, the Court granted Defendants' motion to dismiss the First Amended

Complaint, finding that — among other issues — Plaintiffs had failed to plead scienter.  *See In*

*re Bristol-Myers Squibb Co. CVR Sec. Litig.* ("*BMS I*"), 658 F. Supp. 3d 220 (S.D.N.Y. 2023)

(ECF No. 110).  With leave of Court, *see id.* at 239, Plaintiffs thereafter filed the operative

Second Amended Complaint ("SAC"), ECF No. 115, adding allegations in an effort to address

that defect.  Although the SAC includes all of the claims and most of the Defendants from the

prior pleading, Plaintiffs confirm that the only claims they are still pressing are those against

BMS, Dr. Giovanni Caforio, and Dr. Samit Hirawat under Sections 10(b) and 20(a) of the

Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to

dismiss those claims, arguing that, among other things, Plaintiffs still do not plausibly allege

scienter.  *See* ECF No. 118.  The Court agrees.  Thus, and for the reasons that follow,

Defendants' motion is GRANTED, and the SAC is dismissed.

**BACKGROUND**

The following facts, taken from the SAC, documents it incorporates by reference, and

matters of which the Court may take judicial notice, are construed in the light most favorable to

Plaintiffs.  *See, e.g.*, *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013); *ATSI*

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (stating that a court may

consider "legally required public disclosure documents filed with the SEC").

**A.  Relevant Facts**

BMS is a publicly traded global pharmaceutical company.  SAC ¶ 63.  Dr. Caforio is

BMS's Chief Executive Officer, and Dr. Hirawat is its Chief Medical Officer.  *Id.* ¶ 13.

On January 2, 2019, BMS entered into a preliminary merger agreement with Celgene

Corporation ("Celgene"), another pharmaceutical company, pursuant to which each share of

Celgene common stock would be exchanged for one share of BMS common stock, fifty dollars

in cash, and one CVR.  *Id.* ¶ 122; *see* ECF No. 120-1 ("Joint Proxy"), at 3.  According to the

agreement, the CVRs would trade on a stock exchange and would pay out nine dollars per CVR

— $6.4 billion in total — but *only if* three drugs that Celgene had been developing, Liso-cel, Ide-

cel, and Ozanimod (together, the "Milestone Drugs"), were approved by the FDA by certain

deadlines — in the case of Liso-cel, by December 31, 2020 (the "Liso-cel Milestone Deadline").

SAC ¶¶ 112, 123; *see also* Joint Proxy 4, 217-21.  If even *one* Milestone Drug was approved *one*

*day* late, the CVRs would expire worthless.  *See* SAC ¶ 112.  Celgene's shareholders voted to

approve the merger on April 12, 2019.  *Id.* ¶ 126.  On November 20, 2019, the merger (the

"Merger") closed and the CVRs were issued.  *Id.* ¶ 25.

2

Celgene initiated the FDA approval process for Liso-cel before the Merger. *Id.* ¶ 127.

After a series of setbacks and delays — the particulars of which are described in the Court's

prior Opinion and Order, *see BMS I*, 658 F. Supp. 3d at 227-28, and need not be repeated here —

the FDA's inspections of the two manufacturing facilities slated to produce Liso-cel were not

completed until early December 2020, only weeks before the Liso-cel Milestone Deadline. *Id.*

¶¶ 142-43, 154.  The FDA found multiple regulatory violations at both facilities, which required

BMS to respond with remediation plans. *Id.* ¶¶ 145-49, 154-63.  BMS fully responded by the

FDA's mandated deadline of December 23, 2020, *id.* ¶ 166, but FDA approval of Liso-cel did

not come until February 5, 2021 — roughly five weeks after the December 31, 2020 Liso-cel

Milestone Deadline, *id.* ¶ 185.  Accordingly, and notwithstanding the timely approvals of both

Ozanimod and Ide-cel, the CVRs expired worthless. *Id.* ¶ 184.

Not surprisingly, litigation followed.  First, in a case also pending before the undersigned,

the CVR Agreement trustee sued BMS for breach of contract by failing to use "diligent efforts"

to meet the Liso-cel Milestone Deadline. *See UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, No.

21-CV-4897 (JMF) (S.D.N.Y. filed June 3, 2021).  Second, Plaintiffs filed this putative class

action.[1]  Broadly speaking, Plaintiffs' surviving claims arise from statements made by Dr.

Caforio, Dr. Hirawat, and BMS after the Merger "concerning the 'diligent' efforts [BMS] would

make to meet the Milestone[ Deadlines], the likelihood that the Milestone[ Deadlines] would be

met, and the purported value of the CVRs." SAC ¶ 9.  They include statements made in

presentations, press releases, earnings calls, and SEC filings between December 8, 2019, and

---

[1]      In yet another case, removed from state court to this Court and then remanded, a CVR
holder sued BMS for making false and misleading statements in a Registration Statement filed
with the SEC in connection with the CVRs.  *See Williams v. Bristol-Myers Squibb Co.*, No. 21-
CV-9998 (JMF), 2022 WL 4345564 (S.D.N.Y. Sept. 19, 2022).

**SPA-4**

November 16, 2020. *See id.* ¶¶ 232-79. Plaintiffs' claims are all premised on the same theory:

that "Bristol intended to slow-roll the FDA application process . . . so that it would miss at least

one FDA milestone and avoid making the $6.4 billion CVR payment." *E.g., id.* ¶ 231.

**B.  Procedural History**

As noted, the Court previously granted Defendants' motion to dismiss the First Amended

Complaint. As relevant here, the Court dismissed Plaintiffs' Section 10(b) and Rule 10b-5

claims on the ground that Plaintiffs had failed to adequately allege scienter. *See BMS I*, 658 F.

Supp. 3d at 235. More specifically, the Court concluded first that Plaintiffs' "motive and

opportunity" arguments fell short because the First Amended Complaint did not allege that any

individual Defendant had personally benefited from any alleged misstatement. *See id.* at 231. It

rejected Plaintiffs' reliance on the "'massive' size of the alleged fraud," individual Defendants'

interest in "potential 'increases in the value of their millions of dollars' worth of [BMS] common

stock,'" and "the fact that BMS 'refus[ed] to buy back any CVRs on the open market . . . [when]

the CVRs were trading well below the $9 payout." *Id.* at 231-32. Next, the Court found

Plaintiffs' "conscious misbehavior or recklessness" allegations wanting because they failed to

demonstrate that any individual Defendant had actually known or should have known of the

purported missteps that led to the delay of FDA approval. *See id.* at 232-35. Plaintiffs'

allegations about "missteps during the Liso-cel approval process," generalized allegations by an

"FDA Biologics Expert" and eight confidential witnesses about what individual Defendants

should have known, and invocation of the "core operations doctrine" failed to give rise to an

"inference of scienter at least as strong as any opposing inference." *Id.* (internal quotation marks

omitted). The Court concluded that scienter had not been adequately alleged as to either the

individual Defendants or BMS itself. *See id.* at 235. Given the absence of a "primary violation,"

the Court also dismissed Plaintiffs' "controlling person" claims under Section 20(a) of the Exchange Act.  *See id.* at 238.

But the Court granted Plaintiffs leave to amend their Exchange Act and SEC Rule 10-b claims, *see id.* at 239, which Plaintiffs timely did.  The SAC includes several sets of new allegations that, Plaintiffs contend, bolster the case for scienter.  With respect to Defendants' motive and opportunity, it includes additional allegations regarding the importance of the Celgene merger and the approval of Liso-cel to BMS.  *See* ECF No. 121 ("Pls.' Opp'n"), 15 (citing SAC ¶¶ 10-14, 19, 92-94, 105-114, 116-120, 173, 206).  With respect to Plaintiffs' arguments concerning circumstantial evidence of scienter, the SAC provides "substantial new allegations demonstrating Bristol's corporate structure ensured that its leadership, including the Individual Defendants, knew about the Liso-cel submission and approval failures."  *Id.* at 1.  It also adds new allegations, most notably from their "FDA Biologics Expert" and from three new Confidential Witnesses ("CWs"), to the effect that BMS and the individual Defendants must have been aware of the various deficiencies in BMS's conduct throughout the FDA approval process.  *See id.* at 2.  And finally, it includes statistical analysis from the FDA Biologics Expert and allegations from the CWs purporting to show "that the missed Milestone date cannot be blamed on the COVID-19 pandemic or mere 'mismanagement.'"  *Id.* at 2-3.

### LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018).  A court will not dismiss any claims unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that

contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  More specifically, the plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Further, if the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [those claims] must be dismissed."  *Id.* at 570.

Because Plaintiffs allege securities fraud, they must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2), which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — be pleaded with particularity.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted); *see, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (noting that scienter is an element of a Section 10(b) and Rule 10b-5 claim); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (noting that, to state a control-person claim under Section 20(a), a plaintiff must, at a minimum, plead a plausible "primary violation" of Section 10(b)); *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19-CV-10825 (JPO), 2021 WL 212337, at *11 (S.D.N.Y. Jan. 21, 2021) (holding that the plaintiffs failed to plead corporate scienter "because they have not proven that anyone 'whose intent could be imputed to the corporation acted with the requisite scienter'" (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008))).

To satisfy the PSLRA's scienter requirement, a complaint must, with respect to each defendant and "'with respect to each act or omission alleged to [constitute securities fraud], state

with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ATSI Commc'ns*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(2)); *see, e.g.*, *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020) ("[I]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant . . . ."); *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (noting that a plaintiff must "allege facts supporting a strong inference with respect to *each* defendant" (emphasis added)). The "strong inference" must be "more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314. The necessary inquiry is "inherently comparative." *Id.* at 323. That is, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. A complaint alleging securities fraud will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

In this Circuit, a plaintiff may satisfy the scienter pleading requirement in either of two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. The former requires a plaintiff to allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)). The latter requires allegations of either actual intent or "conscious recklessness — *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015). More specifically, a plaintiff must allege conduct by a

defendant that is, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted). Notably, where "there is no evidence of motive, . . . the strength of the circumstantial allegations [of scienter] must be correspondingly greater." *Marcu v. Cheetah Mobile, Inc.*, No. 18-CV-11184 (JMF), 2020 WL 4016645, at *7 (S.D.N.Y. July 16, 2020) (internal quotation marks omitted).

## DISCUSSION

Measured against the foregoing standards, the Court concludes that Plaintiffs' allegations of scienter still fall short. Given that the Court reached a similar conclusion in *BMS I* with respect to the allegations in the First Amended Complaint, the Court focuses here — as the parties do in their briefing — on the allegations that Plaintiffs added to the SAC.[2]

### A. Motive and Opportunity

First, Plaintiffs' arguments with respect to the motive-and-opportunity prong of the scienter test fall short for the same reason they did before: They still fail to allege that the individual Defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198 (internal quotation marks omitted). Plaintiffs contend that they have added new allegations beyond the "massive" size of the alleged fraud, including "the enterprise-level importance of the Celgene merger; the importance of the incorporation of Celgene's therapies, including Liso-cel, on the success of the merger; the extraordinary press attention Liso-cel and

---

[2]     Plaintiffs cite as evidence of scienter that BMS "executives regularly spoke in detail about the state of the Liso-cel approval process," Pls.' Opp'n 11-12, and "the significance of the Celgene merger" to the company, *id.* at 12-13. The Court rejected virtually identical arguments in its prior Opinion and Order, *see BMS I*, 658 F. Supp. 3d at 233 n.6, 234, and thus does not focus on them here.

## SPA-9

the merger received; the recent underperformance in Bristol's stock and the slew of criticisms

that had recently been levied against Defendant CEO Caforio and the rest of Bristol's leadership,

and the recognition that the Celgene merger was seen as an opportunity to reverse that trend."

Pls.' Opp'n 15.  At bottom, however, these allegations add little to what Plaintiffs previously

argued, namely that the individual Defendants had a motive to keep BMS's stock price high.  *See*

*BMS I*, 658 F. Supp. 3d at 231-32.  But as the Court previously ruled, "'maintain[ing] a high

stock price . . .' is a paradigmatic objective 'generally possessed by most corporate directors and

insiders' and thus does not suffice."  *Id.* at 231 (quoting *S. Cherry St., LLC v. Hennessee Grp.*

*LLC*, 573 F.3d 98, 109 (2d Cir. 2009)).

　　　　Two additional considerations undercut Plaintiffs' motive-and-opportunity arguments.

First, as the Court previously explained, "the absence of any allegation that the [individual]

Defendants purchased additional shares of BMS stock during the lifespan of the CVRs

undermines Plaintiffs' [theory], as the gravamen of [the theory] is that the [individual]

Defendants knew, 'all [the] while,' that the Milestone Deadlines would be missed and, thus, that

the market was underpricing BMS stock."  *Id.* at 231-32 (quoting ECF No. 105, at 3, 19-20).

Second, as Defendants note, *see* ECF No. 119 ("Defs.' Mem."), at 20, Plaintiffs' contention that

Defendants were motivated to breach BMS's obligations in order to avoid the $6.4 billion CVR

payments "defies economic reason."  *ECA*, 553 F.3d at 203.  That is because any failure to

secure timely FDA approval was certain to trigger a lawsuit seeking equivalent damages for

breach of the CVR agreement — as it did.  *See UMB Bank, N.A. v. Bristol-Myers Squibb Co.*,

No. 21-CV-4897 (JMF) (S.D.N.Y. filed June 3, 2021).  Thus, the individual Defendants could

not and would not have assumed that a deliberate plan to scuttle FDA approval by the Milestone

Deadlines would have "spare[d] Bristol a . . . $6.4 billion payout," as Plaintiffs allege.  SAC ¶ 7.

**B. Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness**

As noted, where, as here, "there is no evidence of motive, . . . the strength of the circumstantial allegations [of scienter] must be correspondingly greater." *Marcu*, 2020 WL 4016645, at *7 (internal quotation marks omitted).  Plaintiffs' new allegations are still not enough for them to meet this "demanding requirement[]."  *Id.*

**1. Corporate Structure**

To begin, Plaintiffs contend that "the SAC features substantial new allegations demonstrating Bristol's corporate structure ensured that its leadership, including the Individual Defendants, knew about the Liso-cel submission and approval failures."  Pls.' Opp'n 1.  More specifically, Plaintiffs cite two categories of new allegations regarding "corporate structure": first, that the individual Defendants served on committees with oversight authority relating to the drug approval process and the Celgene integration, *see id.* (citing SAC ¶¶ 37-40, 178-82), and second, that there was "extensive direct communication between Bristol's senior personnel, including Defendant Caforio, and the FDA regarding the Company's Liso-cel submissions and approval process failures," *id.* (citing SAC ¶¶ 41, 46, 175).  Neither category passes muster.

As to the first, it is well settled that "[m]ere membership in a committee with oversight responsibilities," which is all that Plaintiffs allege, "is not enough to give rise to an inference of recklessness."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 653 (S.D.N.Y. 2007).  As this Court has explained elsewhere, "general allegations about the responsibilities of [a] committee, and what its members might have learned, are, at bottom, speculative and, thus, insufficient to show scienter."  *Africa v. Jianpu Tech. Inc.*, No. 21-CV-1419 (JMF), 2022 WL 4537973, at *11 (S.D.N.Y. Sept. 28, 2022).  In arguing otherwise, Plaintiffs contend that "[c]ourts regularly find that corporate committee membership supports an inference of scienter regarding the information

10

within that committee's jurisdiction." Pls.' Opp'n 9. But the cases Plaintiffs cite do not support such a broad proposition. *See In re Peabody Energy Corp. Sec. Litig.*, No. 20-CV-8024 (PKC), 2022 WL 671222, at *22 (S.D.N.Y. Mar. 7, 2022) (finding a "strong inference of conscious recklessness" by members of a task force formed specifically to monitor the very issue that was the subject of the allegedly misleading statements in response to warning signs); *Venkataraman v. Kandi Techs. Grp., Inc.*, No. 20-CV-8082 (LGS), 2022 WL 4225562, at *7 (S.D.N.Y. Sept. 13, 2022) (finding "sufficient circumstantial evidence of recklessness or conscious misbehavior" based on allegations that, at a meeting, defendants gathered specific "facts or . . . information suggesting that their public statements were not accurate"); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13-CV-214 (HB), 2014 WL 285103, at *5 (S.D.N.Y. Jan. 27, 2014) ("The alleged failure [of an audit committee] to take any action in response to *acknowledged* reporting failures supports a finding of scienter." (emphasis added)); *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 144-45 (E.D.N.Y. 2008) (finding "that the 'red flags' evident on the face of the unanimous consent forms, *coupled with* [defendants'] likely experience and knowledge" based in part on their committee membership plausibly alleged scienter (emphasis added)).

Second, the SAC's new allegations do not support Plaintiffs' assertion "that numerous senior Bristol executives," including Dr. Caforio, "were in *direct communication* with the FDA regarding the Liso-cel approval process, and knew through both Bristol's FDA submissions and the direct communications from the FDA in response thereto" of the various alleged missteps during the approval process. Pls.' Opp'n 7. For example, the SAC alleges that FDA "inspection warning letters were regularly addressed to [Dr.] Caforio personally," but it attaches in support a letter pertaining to an entirely unrelated inspection. SAC ¶ 175. It also alleges that "letters

exchanged between the FDA and Bristol . . . cc'ed as many as *forty* individuals at Bristol,

including senior executives from Global Regulatory Sciences, Global Risk Management, Global

Drug Development, and Global Development Operations," but it conspicuously does not allege

that the recipients included Dr. Caforio or Dr. Hirawat.  *Id.* ¶¶ 41, 182.  And it alleges that

"*dozens* of Bristol employees attended the March and September 2020 meetings with the Center

for Biologics Evaluation and Research ('CBER')" relating to the approval process, but once

again fails to tie this allegation to any Defendant.  *Id.*  Even taken together, therefore, these

allegations do not constitute strong circumstantial evidence of conscious misbehavior or

recklessness.

### 2.  New Expert and CW Allegations

Next, Plaintiffs cite added allegations from their FDA Biologics Expert and three new

CWs in arguing that the individual Defendants "would have been aware of underlying issues

regarding the FDA approval process for Liso-cel," SAC ¶ 47, 177, but these allegations also fail

to nudge Plaintiffs' pleadings across the plausibility line.[3]  They add opinions from the FDA

Biologics Expert suggesting generally that in circumstances like the ones here, pharmaceutical

executives would be aware of and be able to avoid the missteps that allegedly befell the Liso-cel

approval process.  *See, e.g.*, SAC ¶¶ 27, 29, 49, 146.  These opinions, however, are no different

from those the Court found wanting in the First Amended Complaint.  They too do not speak to

the knowledge of the individual Defendants specifically.  And, again, it is well established that

an expert may not opine on the state of mind or knowledge of a party.  *See, e.g.*, *Anderson News,*

*L.L.C. v. Am. Media, Inc.*, No. 09-CV-2227 (PAC), 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20,

---

[3]      As in its earlier Opinion and Order, *see BMS I*, 658 F. Supp. 3d at 233 n.7, the Court need
not decide whether or to what extent it may consider the FDA Biologics Expert's opinions or
information from the CWs, as it would not affect the Court's analysis or conclusions.

2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d

396, 479 (S.D.N.Y. 2016).  Plaintiffs' new CW allegations fare no better.  For starters, Plaintiffs

still fail to allege that any of the CWs, new or old, had any "contact with the individual

defendants that would be probative of [the] defendants' mental state."  *Long Miao v. Fanhua,*

*Inc.*, 442 F. Supp. 3d 774, 799 n.19 (S.D.N.Y. 2020); *see also Campo v. Sears Holdings Corp.*,

635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009) (finding no scienter where the confidential witnesses

cited in the complaint were not alleged to have interacted with the defendants), *aff'd*, 371 F.

App'x 212 (2d Cir. 2010).  And in any event, the allegations from CW #9 and CW #10 that the

individual Defendants "would have been" kept apprised of updates regarding the approval

process, SAC ¶ 47; *see id.* ¶ 177, and from CW #11 that his or her mid-December 2020 vacation

would not have been approved had BMS thought there was a chance Liso-cel would be approved

by the Milestone date, *id.* ¶ 165, fall far short of providing that the individual Defendants knew

or should have known that their statements were false or misleading.

####    3.   **Statistical Analyses**

Finally, Plaintiffs add new allegations and statistical analyses purporting to show that no

alternative explanation for the delay in Liso-cel approval is more plausible than knowing

misconduct on the part of Defendants.  The analysis of their FDA Biologics Expert, they

contend, shows that "there is a statistically significant difference between the 13-month approval

time for Liso-cel and the approval times for [biologics that are directly comparable to Liso-cel]."

*Id.* ¶¶ 203-05.  They allege that this timeline "is a *statistical anomaly, even as compared to*

*similar drugs undergoing the approval process during the COVID-19 pandemic*."  *Id.* ¶ 205.  But

as the Court noted in dismissing the First Amended Complaint, "how the FDA handled other

approvals during the pandemic has no bearing on Defendants' actions and knowledge —

Defendants did not determine the FDA's priorities and how it should deploy its resources during the pandemic." *BMS I*, 658 F. Supp. 3d at 235.  Thus, allegations of this nature still do not give rise to a strong inference of scienter.  Instead, they more likely support an inference of corporate (or government agency) "mismanagement," which is insufficient.  *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 721 (S.D.N.Y. 2018).[4]

## CONCLUSION

For the foregoing reasons, the Court once again concludes that Plaintiffs' allegations fall short of establishing that the individual Defendants acted with the requisite scienter.  And once again, the Court reaches the same conclusion with respect to BMS itself because the SAC "fail[s] to 'create a strong inference either (1) that someone whose intent could be imputed to [BMS] acted with the requisite scienter or (2) that the [alleged misstatements] would have been approved by corporate officials sufficiently knowledgeable about [BMS] to know that those statements were misleading.'" *Town of Davie Police Officers Ret. Sys. v. City of N. Mia. Beach Police Officers' & Firefighters' Ret. Plan*, No. 21-909-CV, 2021 WL 5142702, at *3 (2d Cir. Nov. 5, 2021) (summary order) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015)).  Accordingly, Plaintiffs' Section 10(b) and Rule 10b-5

---

[4]    On September 1, 2023, Plaintiffs filed a notice of supplemental authority, arguing that a then-recent opinion from the United States District Court for the Eastern District of Virginia — *In re James River Group Holdings, Ltd. Securities Litigation*, No. 21-CV-444 (DJN), 2023 WL 5538218 (E.D. Va. Aug. 28, 2023) — supports their position.  *See* ECF No. 123.  But *James River* is obviously not binding upon this Court.  Nor does it support Plaintiffs position, substantially for the reasons set forth in Defendants' response.  *See* ECF No. 124.  In finding that the plaintiffs' allegations supported an inference of scienter when "[a]ssess[ed] . . . holistically," 2023 WL 5538218, at *19, the *James River* court emphasized, for example, that the executive defendants had been members of a "Reserve Committee," which had a "*specific* role in setting Commercial Auto Division reserves," and that they "received audit reports showing under-reserving of Uber claims" — the very subject of the allegedly misleading representations.  *Id.* (emphases altered).  As discussed above, no such specific allegations are present here.

claims must be and are dismissed for failure to adequately allege scienter.[5]  It follows that

Plaintiffs' "controlling person" claims must be and are dismissed as well.  *See, e.g.*, *Ark. Pub.*

*Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356-57 (2d Cir. 2022).

     In a footnote, Plaintiffs request leave to amend their pleadings once again, citing the fact

that, as of the time of briefing, they had "several outstanding FOIA requests" and that they

"expect[ed] these requests to be fulfilled within weeks and thus would have additional

information to further supplement their pleadings."  Pls. Opp'n 25 n.30.  That request is denied.

"Where it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse

of discretion to deny leave to amend."  *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d

Cir. 1993).  The Court already gave Plaintiffs a second opportunity to amend.  *See BMS I*, 658 F.

Supp. 3d at 239.  On top of that, Plaintiffs fail to identify any facts in their possession that would

cure the defects discussed above — even though nearly eight months  have passed since they

filed their brief and, thus, they have presumably received whatever documents they hoped to get

in response to their FOIA requests.  In light of the foregoing, the Court concludes that any

amendment would be futile.  *See, e.g.*, *Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL

1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (citing cases).

     One final housekeeping matter remains.  Under the PSLRA, the Court is required to

"include in the record specific findings regarding compliance by each party and each attorney

representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil

Procedure as to any complaint, responsive pleading, or dispositive motion."  15 U.S.C. § 78u-

4(c)(1).  Because all legal claims and defenses presented throughout this litigation were

---

[5]    In light of that conclusion, the Court need not and does not reach Defendants' other
arguments for dismissal, namely that Plaintiffs fail to allege any material misrepresentation, *see*
Defs.' Mem. 11-18, and fail to plausibly allege loss causation, *see id.* at 23.

nonfrivolous under existing law and all factual contentions had evidentiary support or were

reasonably based on belief or a lack of information, no sanctions under Rule 11 are warranted.

The Clerk of Court is directed to terminate ECF No. 118, to enter judgment for

Defendants, and to close this case.

SO ORDERED.

Dated: February 29, 2024
        New York, New York
                                        _____
                                        JESSE M. FURMAN
                                        United States District Judge

# SPA-17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
IN RE:

BRISTOL-MYERS SQUIBB COMPANY CVR                                21 **CIVIL** 8255 (JMF)
SECURITIES LITIGATION

                                                                **JUDGMENT**

-------------------------------------------------------------X

      It is, **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated February 29, 2024, the Court once again has

concluded that Plaintiffs' allegations fall short of establishing that the individual Defendants acted

with the requisite scienter. And once again, the Court has reached the same conclusion with respect

to BMS itself because the SAC "fail[s] to 'create a strong inference either (1) that someone whose

intent could be imputed to [BMS] acted with the requisite scienter or (2) that the [alleged

misstatements] would have been approved by corporate officials sufficiently knowledgeable about

[BMS] to know that those statements were misleading.'" Town of Davie Police Officers Ret. Sys.

v. City of N. Mia. Beach Police Officers' & Firefighters' Ret. Plan, No. 21-909-CV, 2021 WL

5142702, at *3 (2d Cir. Nov. 5, 2021) (summary order) (quoting Loreley Fin. (Jersey) No. 3 Ltd.

v. Wells Fargo Sec., LLC, 797 F.3d 160, 177 (2d Cir. 2015)). Accordingly, Plaintiffs' Section 10(b)

and Rule 10b-5 claims must be and are dismissed for failure to adequately allege scienter. It

follows that Plaintiffs' "controlling person" claims must be and are dismissed as well. See, e.g.,

Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co., 28 F.4th 343, 356-57 (2d Cir. 2022). In a

footnote, Plaintiff's request leave to amend their pleadings once again, citing the fact that, as of the

time of briefing, they had "several outstanding FOIA requests" and that they "expect[ed] these

# SPA-18

requests to be fulfilled within weeks and thus would have additional information to further supplement their pleadings." Pls. Opp'n 25 n.30. That request is denied. "Where it appears that granting leave to amend is unlikely to be productive,... it is not an abuse of discretion to deny leave to amend." Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993). The Court already gave Plaintiffs a second opportunity to amend. See BMS I, 658 F. Supp. 3d at 239. On top of that, Plaintiffs fail to identify any facts in their possession that would cure the defects discussed above even though nearly eight months have passed since they filed their brief and, thus, they have presumably received whatever documents they hoped to get in response to their FOIA requests. In light of the foregoing, the Court concludes that any amendment would be futile. See, e.g., Roundtree v. NYC, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (citing cases). One final housekeeping matter remains. Under the PSLRA, the Court is required to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1). Because all legal claims and defenses presented throughout this litigation were nonfrivolous under existing law and all factual contentions had evidentiary support or were reasonably based on belief or a lack of information, no sanctions under Rule 11 are warranted.  Judgment is entered for Defendants; accordingly, the case is closed.

**Dated:**  New York, New York
February 29, 2024

**RUBY J. KRAJICK**
_____
**Clerk of Court**

BY:  K. Mango
_____
**Deputy Clerk**
